Alan ELLIOT et al., Plaintiffs,

v.

John A. VOLPE et al., Defendants.

Civ. A. No. 70–869.

United States District Court,
D. Massachusetts.

April 16, 1971.

Stephen J. Teichner, Melvyn Zarr, Boston, Mass., for plaintiffs.

Herbert P. Gleason, Corp. Counsel, Boston, Mass., amicus curiae City of Boston.

Thomas P. August, City Sol., Somerville, Mass., amicus curiae City of Somerville.

Robert H. Quinn, Atty. Gen., Richard L. Seegel, Asst. Atty. Gen., Boston, Mass., for Edward W. Ribbs.

Herbert F. Travers, Jr., U. S. Atty., James N. Gabriel, Asst. U. S. Atty., Boston, Mass., for John A. Volpe, Francis C. Turner, Edward J. DePina, and Russell Train.

Herman Snyder, Boston Mass., for M. DeMatteo Construction Co.

Richard W. Murphy, Boston, Mass., for The Barletta Co.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

This case came on to be heard on cross-motions for summary judgment filed by plaintiffs and each defendant. Plaintiffs are two residents of Somerville, Massachusetts, and two organizations. One of the organizations is a community group of Somerville citizens (referred to in the complaint as SCAT); the other is a non-profit Massachusetts corporation concerned with transportation issues and problems in the metropolitan area of Boston (referred to in the complaint as GBC).

The defendants herein sometimes referred to as "federal defendants" are: *John A. Volpe,* the Secretary of Transportation of the United States; *Francis C. Turner,* the Director of Public Roads of the Federal Highway Administration of the United States; *Edward J. DePina,* the Massachusetts District Division Engineer of the Bureau of Public Roads of the United States; and *Russell Train,* the Chairman of the Council for Environmental Quality in the Executive Department of the United States.

Other defendants herein sometimes referred to as "state defendants" are: *Edward W. Ribbs,* the Commissioner of the Department of Public Works of the Commonwealth of Massachusetts; *M. DeMatteo Construction Company* (DeMatteo), a Massachusetts corporation engaged in the construction of public highways; and *The Barletta Company* (Barletta), a Massachusetts corporation also engaged in the construction of public highways.

Plaintiffs seek to halt the further construction of Interstate Highway 93 (I–93). To accomplish that result they ask that the state defendants be enjoined from the actual construction work, and from approval of, and commitment of the resources of the Commonwealth to, construction of I–93 through the City of Somerville, that the federal defendants be enjoined from further authorization and payment of federal funds, and that defendant Train be ordered to fulfill his responsibilities to protect the aesthetic and environmental values in Somerville from the effects threatened by the construction. Plaintiffs object to the actions of the defendants in furthering the construction, and seek the relief referred to, on the ground there has been no compliance with the require-

ments of law applicable to the design of I–93 through Somerville. At the hearing of the motions for summary judgment plaintiffs expressly disavowed any objection to the location and route of I–93 through Somerville.

The contentions of plaintiffs are that:

(a) the provisions of 23 U.S.C. § 128, as amended August 23, 1968, and the provisions of the Policy and Procedure Memorandum 20–8 (PPM 20–8), promulgated January 14, 1969, apply to project I–93 in Somerville, and defendants have failed to comply with the requirements thereof applicable to the design of I–93; and

(b) the provisions of 42 U.S.C. § 4321, et seq., effective January 1, 1970, apply to project I–93 in Somerville, and defendants have failed to comply with the requirements thereof applicable to the design of I–93.

All defendants contend that none of the provisions of law relied upon by plaintiffs are applicable on the issue of the design of the highway, and further contend plaintiffs are guilty of laches. The state defendants contend in addition that the action is one against the Commonwealth of Massachusetts in its governmental capacity, and that Massachusetts has not consented to be sued. This will be the first question considered. The City of Boston and City of Somerville were permitted to file a brief as amicus curiae that supports plaintiffs' claims.

### A. *Defense of Sovereign Immunity*

■ The action against the defendant Ribbs is declared to be against him individually and as he is Commissioner of Public Works of the Commonwealth. The only relief sought is that he be enjoined "from further commitment of state resources and approval to construction of I–93 through Somerville". Such relief, if granted, would interfere directly with the administration of the public business of the Commonwealth and prevent it from carrying out its governmental obligations. See

Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921). There are no allegations that defendant Ribbs, apart from his capacity as Commissioner, can exercise any control or has any role in the further construction of I–93 in Somerville. No relief is sought than relief against him as Commissioner of Public Works. There is no evidence that the Commonwealth has given its consent to be sued in the context of this litigation. The court concludes that the defense of sovereign immunity of the Commonwealth can be raised by Ribbs as a defense against the complaint, for the action against him is in fact and in law one against the State. *See* In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887); Citizens Comm. for Hudson Valley v. Volpe, 297 F.Supp. 809 (S.D.N.Y.1969); DeLong Corp. v. Oregon State Highway Comm'n, 233 F. Supp. 7 (D.Ore.1964), aff'd, 343 F.2d 911 (9th Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).

■ The plaintiffs argue, however, that in the circumstances of this case the defense is not available. They assert the Commonwealth impliedly waived its immunity to be sued in this action when it voluntarily undertook construction of its highway system subject to the regulation and control of the Federal Government. To support this contention they cite Parden v. Terminal Ry. of the Ala. State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), and Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen, 404 F.2d 1001 (4th Cir. 1968). These cases, however, are not applicable to the case at bar. The question of waiver of governmental immunity is, as plaintiffs assert, one of federal and not state law. But the "conclusion that there has been a waiver of immunity will not be lightly inferred". Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). Such de-

termination must be made from clear and explicit language. Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Ford Motor Co. v. Dept. of Treasury of Ind., 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Hamilton Mfg. Co. v. Trustees of State Colleges in Colo., 356 F.2d 599 (10th Cir. 1966); S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, 268 F.Supp. 568 (D.N.J.1967). The mere entrance of a state into an area of federal control does not thereby bring about a waiver of governmental immunity. Citizens Comm. for the Hudson Valley v. Volpe, 297 F.Supp. 809, 812 (S.D.N.Y.1969). The cases of Parden v. Terminal Ry., *supra,* and Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen, *supra,* are distinguishable, as the court in Citizens Comm. for the Hudson Valley v. Volpe, *supra,* pointed out, and are not apposite here. Waiver of governmental immunity can be inferred when a state "directly enter[s] a sphere of operation subject to causes of action specifically created by Congress in favor of a specific class * * *." 297 F. Supp. at 812. But such is not the case here, for there is no showing that Congress has created any causes of action favoring plaintiffs, or others. The Administrative Procedure Act, 5 U.S.C. §§ 701, 702, creates no cause of action against the Commonwealth; neither do the requirements of 23 U.S.C. § 128(a). The plaintiffs have not shown any basis for an inference that the Commonwealth has waived the defense of immunity. Accordingly, the defendant Ribbs is entitled to avail himself of it as a complete defense against this action.

The relief sought against DeMatteo and Barletta is that they be enjoined from doing further construction work on I–93 in Somerville. DeMatteo entered into a contract with the Commonwealth on September 26, 1969 for construction of a segment of I–93 through Somerville, and commenced work under the contract on October 30, 1969. Barletta made a contract with the Commonwealth for construction of another Somerville segment in February 1970, and began work March 25, 1970. There are no allegations and no claims that these contractors are performing their work in any manner than in accord with their contracts. On the contrary, the complaint of plaintiffs is that the contractors are, indeed, following the highway design in their contracts. In the construction of the highway work under their contracts DeMatteo and Barletta are instrumentalities of the Commonwealth. Pennsylvania Environmental Council v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970), appeals docketed, Nos. 19453 and 19487, 3rd Cir., November 30, 1970. The relief sought against them, if granted, would interfere with the public business of the Commonwealth and prevent the carrying on of its governmental operations. *See generally,* Larson v. Domestic & Foreign Commerce Corp., *supra;* Land v. Dollar, *supra;* Ex parte New York, *supra;* Pennsylvania Environmental Council v. Bartlett, *supra.* No other relief is sought against the contractors. As in the case against defendant Ribbs, the action here against each contractor must be realistically viewed as action against the Commonwealth, and each contractor as the State's "alter ego". *See generally,* In re Ayers, *supra;* Citizens Comm. for the Hudson Valley v. Volpe, *supra;* DeLong Corp. v. Oregon State Highway Comm'n, *supra.* What has been said above rejecting plaintiffs' contention of waiver of the defense of immunity is applicable with equal force when the defense is raised by the contractors. Pennsylvania Environmental Council v. Bartlett, *supra.* Accordingly, each of them is entitled to raise it as a complete defense to the complaint against them.

B. *Applicability of requirements of 42 U.S.C. § 4321 et seq. to the construction of I–93 in Somerville.*

The National Environmental Policy Act of 1969 (Act), 42 U.S.C. § 4321 et seq., became effective January 1, 1970. The contention of plaintiffs that it is applicable to the construction of the Somerville segments of I–93 involves the

basic question of its applicability to the design of the highway through Somerville on and after its effective date.

When the Act became effective, all of the planning of the Somerville segments had been accomplished. The location had been approved. A formal basic design report had been approved in 1966, and was thereafter modified in February 1967 to authorize the extension of a viaduct "a distance of approximately one block". Right-of-way acquisitions had taken place, and, in the location, there had been work of demolition, excavation, surcharging and grading. The construction plans, specifications and estimate were approved, the DeMatteo contract had been made and work begun under it, and invitations for bids had been advertised for the segment later awarded to Barletta.

To ascribe retrospective effect to the Act, there must be found expression of the legislative will in terms so plain as to admit of no doubt that such was the intention. The rule that statutes are not to be construed retrospectively unless such construction was plainly intended by the legislative body applies with peculiar force when antecedent rights would be affected. *See* Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Union Pac. RR v. Laramie Stock Yards Co., 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913). The Act itself is not made explicitly retroactive, and contains no language which manifests any such intention. The plaintiffs argue, however, that the Act "can still be applied in a practical manner to the remaining action on I–93, and it would still be possible to achieve most of the goals sought by the Act" and the Guidelines, 35 Fed.Reg. 7390 (1970), and Exec. Order No. 11,514, 35 Fed.Reg. 4247 (1970), adopted thereunder. They request the court to order the federal defendants, or one or more of them, to meet the requirements of the Act by:

"utilization of a systematic, interdisciplinary approach in the planning and decision-making concerning future action on I–93, and

"submission of a detailed statement on the environmental impact of the proposed highway, alternatives to the proposed action, and adverse long-term environmental effects."

Brief for plaintiffs at 42. In support of their request plaintiffs reiterate their contention that the Act can still be applied in a practical manner to the remaining action on I–93 "despite the fact that construction has begun, because * * * most of the environmental damage resulting from I–93 has yet to occur". Brief of plaintiffs at 32. The full thrust of plaintiffs' contentions and requests is that the court should now halt the construction of I–93 to afford opportunity to the federal defendants, or one or more of them, purporting to exercise authority under the Act, to consider whether to require changes in the design of I–93 in Somerville and corresponding changes in the construction plans and specifications.

There are no provisions of the Act which expressly authorize or direct the action requested by plaintiffs in the case of contract rights which had vested before the Act became effective, as with DeMatteo, or even at the stage of project I–93 when the planning, including the design planning, had been completed and construction bids had been invited, as with Barletta. It must be presumed that Congress was aware that there were unfinished and incomplete federally aided highway projects in various stages of development when the Act was passed and made effective January 1, 1970. If Congress had intended to authorize federal officers to require changes in the design and construction plans of highway projects after construction contracts had been let or construction bids invited, it could easily have chosen language to express such intention clearly. A careful reading of the Act, and the regulations under it, discloses no language which can be read or interpreted to au-

thorize such radical intervention by federal officers in the ongoing joint plans, functions or programs of Federal, State and local governments. On the contrary, the phrases employed by Congress in the Act: "to use all practicable means and measures", "to use all practicable means, consistent with other essential considerations of national policy", "to the fullest extent possible", must be construed, as the court in Pennsylvania Environmental Council v. Bartlett, *supra*, put it, "to indicate a moderate, flexible and pragmatic approach to the immediate application of the Act".

It is common knowledge that intensification of man's concern with his physical environment was a recent phenomenon in 1969, evidenced by mounting protests presented in legislative halls and before governmental agencies. Congress acted promptly to make environmental quality a matter of governmental concern. It declared national policies and goals and directed Federal agencies to implement such policies and seek attainment of the goals by specifications enumerated in 42 U.S.C. § 4332. It also declared a national policy for the environment in 42 U.S.C. § 4371, which provides for the enhancement of environmental quality, but pointed out in subsection (b) (2) thereof that "[t]he primary responsibility for implementing this policy rests with State and local governments". None of these declarations of policy, or the directives enacted to implement policy, evidence any inflexible design or intention of the Congress to authorize federal officers to review or modify prior-approved basic action in existing joint plans or programs of Federal and State governments in federally aided highway systems. Accordingly, the court finds and rules there were no violations of 42 U.S.C. § 4321 et seq. by the Secretary of Transportation, or any of the federal defendants, as regards the design or construction of I–93 in Somerville, and there is no showing by plaintiffs why relief should be awarded to them against the federal defendants

under the Act. *See* Pennsylvania Environmental Council v. Bartlett, *supra*.

### C. *Applicability of requirements of 23 U.S.C. § 128(a), as amended August 23, 1968.*

■ On August 23, 1968 Congress amended 23 U.S.C. § 128(a) to read (in pertinent part):

Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary [of Transportation] that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic *and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.* (Italicized language added by the amendment.)

The plaintiffs allege violations of the provisions of the statute in the following respects:

that defendants Volpe and Turner each approved the plans, specifications and estimates of I–93 in Somerville, without requiring certification that public hearings were held to consider the economic and social effects of the location and its impact on the environment; and

that defendant Ribbs failed to hold two open hearings to consider I–93, and failed to consider the economic and social effects of such location and its impact on the environment.

The parties hereto stipulated that on May 10, 1960 the then Commissioner of Public Works of the Commonwealth held a hearing in Cambridge on the proposed construction of I–93 in Somerville, and that the general location of I–93 was approved in October 1964 by the Federal Bureau of Public Roads. As above stated, plaintiffs have expressly disavowed objections to the location and route of

I-93 through Somerville. They contend, however, that the requirements of the elements and factors introduced by the amendment "must be met whether or not public hearings are ever held under the terms of the amendment". They also argue that "if hearings are held, they must deal with the subject matter" of the amendment.

The amendment is not made expressly retroactive, and there is nothing in the language of § 128(a) as amended to justify the belief that Congress intended it to be retroactive. Giving the language of the section as amended its plain and natural meaning, the conclusion is compelled that the elements and factors introduced by the amendment were intended to be integrated into the purposes for which the hearings are required to be held, and not intended to require action without regard to the hearings. That such was intended appears also from the legislative history of the amendment. It was enacted as a part of the Federal-Aid Highway Act of 1968. Pub.L.No. 90-495. In the conference report, 1968 U.S. Code Cong. and Adm.News, it is stated at p. 3544:

> The conference substitute amends section 128 of title 23 to require that, *in addition to the economic effects of a route location,* the public hearings held by a State highway department *are also for the purpose of considering the social effects of such location,* its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. (Emphasis added.)

The issue raised here as to the amendment was met in Wildlife Preserves, Inc. v. Volpe, Civil No. 9-70 (D.N.J., June 19, 1970), appeal docketed, No. 19222, 3rd Cir., August 26, 1970, where the court said:

> The plaintiffs' only other contention is that the hearing requirements set forth in Title 23 U.S.C. § 128, as amended effective August 23, 1968, were not complied with. This section

entitled "Public Hearing" when enacted in 1958 required only a "location" hearing to enable the Secretary of Commerce to consider "the economic effects of such a location" 23 U.S.C. § 128(a). Plaintiffs do not suggest that this statute was not complied with by the corridor hearing in November 1961. The amended statute which requires the consideration of additional criteria in no way indicates an intended retroactive effect and this court will give it none.

After the amendment of August 23, 1968, section 128(a) did not require the Massachusetts Department of Public Works to hold a hearing with respect to I-93 in Somerville. Neither did it prohibit nor forbid the defendants Volpe and Turner from giving approval to the plans, specifications and estimates for the construction of the Somerville segments. Accordingly, the court rules there was no violation of the statute by any of the defendants as plaintiffs allege.

### D. *Applicability of PPM 20-8*

The Policy and Procedure Memorandum (PPM 20-8), which is Appendix A to 23 C.F.R., Part 1 (1970), was prepared and issued by the Bureau of Public Roads and became effective January 14, 1969. The plaintiffs claim the defendants have not met the requirements of PPM 20-8 in two respects:

> (a) that no design hearings were held for project I-93, and no opportunity afforded for such hearings, and

> (b) that the Massachusetts Department of Public Works has not given consideration to the social and environmental effects or alternative designs for the highway.

They agree that the question whether PPM 20-8 is applicable to I-93 is an important issue for the court's determination. They further agree that whether a design hearing was required for I-93 after PPM 20-8 became effective January 14, 1969 turns on the question whether *design approval* of the Somerville segments had been granted prior

to that date. It is not contended by plaintiffs that there was any requirement for a separate design hearing under any statute or in the regulations before PPM 20–8 became effective. It is uncontroverted that all that was required prior to PPM 20–8 was a route location hearing. As before stated, that hearing was held May 10, 1960 and approval was given to the Somerville location in October 1964.

The plaintiffs argue that no design approval had been given before PPM 20–8 became effective. They contend it was not until June 30, 1969 and December 23, 1969, respectively, when the plans, specifications and estimates were approved for the respective segments, that design approval was given. These dates, obviously, followed the effective date of PPM 20–8. To support this contention plaintiffs rely mainly on the deposition of Lowell K. Bridwell, a former Federal Highway Administrator, and on D.C. Federation of Civic Associations, Inc. v. Volpe, 316 F.Supp. 754 (D.D.C.1970), appeals docketed, Nos. 24838 and 24843, D.C.Cir., November 25, 1970, (*Three Sisters Bridge Case*). The defendants dispute the assertion that no design approval had been granted before PPM 20–8 became effective. To the contrary, defendants argue there is no genuine issue as to the fact that design approval was granted the Somerville segments at the latest in June 1966. They contend this is made clear from the undisputed history of the progress of project I–93 to the date PPM 20–8 became effective, as that history is examined in light of the provisions of PPM 20–8, the affidavit of Rex I. Wells, the affidavit of defendant Turner, and the decision in Wildlife Preserves, Inc. v. Volpe, *supra*.

The basic innovative feature of PPM 20–8 is the dual public hearing. The newly created "highway design public hearing" is defined in par. 4b. as follows:

A "highway design public hearing" is a public hearing that:

(1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;

(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and

(3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental and other effects of alternate designs.

The PPM does not define or explain the meaning of the phrases "major design features" and "major highway design features" found in par. 4b(2), (3). Subparagraph d(2) of Par. 10 is titled *"Design approval."* It provides:

The division engineer may *approve the highway design* and authorize right-of-way acquisition, approve right-of-way plans, *approve construction plans, specifications and estimates,* or authorize construction, only after the following requirements have been met (emphasis added):

(a) The route location has been approved.

(b) The State highway department has requested highway design approval.

(c) Highway design public hearings required by this PPM have been held, or the opportunity for hearings has been afforded.

(d) The State highway department has submitted the public hearing transcripts and certificates required by section 128, title 23, United States Code.

(e) The requirements of this PPM and of other applicable laws and regulations.

This subparagraph obviously does not undertake to define "design approval". But it refers to numerous steps, in addition to the step "approve the highway design", in the planning and progress of a highway project to the time when con-

struction is authorized. Paragraph 6 relates to "Hearing requirements", and refers to "design approval" several times without defining or explaining it.

What is, therefore, meant by the term "design approval" in PPM 20–8 requires the court's consideration of the common practices and procedures in Federal-aided highway planning and construction at and before promulgation of the PPM, and of the purposes of the PPM.

The witnesses whose testimony, either by way of deposition or affidavits, bear upon the meaning of "design approval" gave expression to their respective personal interpretations. Each was involved in some manner in the preparation of PPM 20–8 prior to its promulgation. None of the witnesses referred to any administrative practice of the Federal Highway Administration taken under PPM 20–8. It appears obvious that there has not been enough time since its promulgation for that to develop. In the absence of evidence of that character, which, of course, would have much weight and probative force, the court in finding the meaning of "design approval" is not restricted to the opinions of those who were involved in the preparation of the PPM, though such opinions ordinarily will be given careful consideration. But here the views of Lowell Bridwell, on the one hand, and of Mr. Wells and the defendant Turner, on the other, cannot be reconciled on the meaning of design approval. This poses the problem for the court to determine whether the witnesses are expressing their personal predilections. Nevertheless, the court has given careful consideration to Mr. Bridwell's deposition, since he was Federal Highway Administrator at the time, after subjecting it to the tests for reliability applied to the testimony of other witnesses.

Mr. Bridwell's views are substantially shown in the following excerpts from his deposition:

Q. Could you explain, please, what is meant by the terms design approval as used in that paragraph [par. 6d(2) of PPM 20–8]?

A. Design approval. I would have to insert the word *"final"* design approval which is achieved at that point when the Bureau of Public Roads approves a [summation] titled and generally referred to as plans, specifications, and estimates, as it relates to both of these paragraphs. (Emphasis added.)

* * * * * *

Q. * * * Could you define plans, specifications and estimates? What is your definition of it?

A. Plans, specifications and estimates, those words thereby constituting a phrase are specifically used in the statute Title 23, the particular section number I do not recall and are statutory requirements and represent one activity in a set of activities required by statute for federal aid, for participation on a project.

Q. I don't think you responded to the question, I will try again. Let us say we are at the construction stage of a project. Everything is approved. The state wants to let contracts out to bid, okay? Make that assumption. You know where the road is going to go. The right-of-way is acquired. You know what the road is supposed to look like, whether it is going to be raised or depressed, all these things, the interchanges and everything else, the terms, plans, specifications and estimates at this stage would refer to the actual working, drawings and specifications from which a contractor would submit his bid to the state for the cost of construction of that portion of the highway. Is that correct?

A. Yes, P.S. & E. The answer vaguely is yes. I would like to, if I may, specify it would consist of a specific set of construction plans which also contain the specifications which the contractor must meet and the state Highway

Departments estimate on what it is going to cost.

The court finds his interpretation not persuasive. In the first place, much as Mr. Bridwell would prefer to have the word "final" inserted before the words "design approval", it is not found in the PPM. Furthermore, if it were intended by the promulgation of PPM 20–8 that "design approval" would be synonymous with "construction plans, specifications and estimates", even for projects commenced after its effective date, the language could easily and clearly have said so. Moreover, as applied to projects in progress and ongoing when PPM 20–8 became effective, Mr. Bridwell's interpretation of "design approval" and his explanation of it leaves unanswered several crucial questions. It fails to take into account the significance given to decisions regarding the general geometry of a highway prior to the effective date of PPM 20–8 in its relation to physical and topographical features of the highway location and adjacent land and structures in densely settled areas. His interpretation gives no apparent weight to crucial decisions determining the magnitude of the highway structures and the highway profiles. Such decisions frequently involve determination whether the highway will span or tunnel intersecting waterways and highways, whether it will be elevated or depressed through residential and other areas, how access routes to and exits from the highway will connect with local highway systems, where interchanges will be erected and what will be their conformations, how and where public utilities will be relocated, etc. When approved, these decisions obviously establish the major design features of the highway, and when reduced to sketches and drawings show what the highway segment will look like if and when constructed. Approval of the design decisions is one of the most important steps taken in planning a highway, for until design approval is given there is usually no authorized guidelines on which to predicate the work of site preparation or construction plans, specifications and estimates. PPM 20–8 clearly recognizes the importance and role of design approval. It treats it as a separate stage in the development of the highway project. Mr. Bridwell's interpretation fails to accord it the important function intended by PPM 20–8 and by customary administrative practices and procedures of highway planning and construction. It is conceivable, of course, in a given case that construction plans, specifications and estimates might be approved contemporaneously with the approval of design decisions, but the former necessarily depend upon and must logically and chronologically follow design approval. These basic considerations impel the court to the conclusion that design approval is an independent stage of highway planning, that construction plans, specifications and estimates are dependent on design approval, and that design approval in PPM 20–8 is not synonymous with approval of construction plans, specifications and estimates. Further, in the case of a highway project begun before the effective date of PPM 20–8 and not then completed, the question whether design approval occurred before the PPM effective date is an issue of fact for the court. And the determination of that issue is not affected by the likelihood of subsequent incidental changes in the construction details of the project, changes which not infrequently occur, as long as they do not derogate from the basic major design features.

There is nothing inconsistent with this ruling in D.C. Federation of Civic Associations, Inc. v. Volpe, *supra*. The court there observed in passing that the interpretation appeared reasonable (as argued by the plaintiff) that "it may be inferred * * * the Court of Appeals interpreted 'design approval' as approval of the final plans, specifications and estimates for the project". Nonetheless, the court went on to examine in detail the factual history of the project for the purpose of making relevant findings of fact on the design issue, and expressly

found (1) that no design approval of the *Three Sisters Bridge* was requested in 1966, (2) that no design approval was granted at that time, (3) that what was then requested was "approval of final location alignment", (4) that the 1964 hearing did not adequately deal with design issues relating to the major design features of the bridge being considered in 1970, and (5) "that the present design of the bridge is so substantially different from that proposed in 1964, that the public should be given an opportunity to present their views on the project as presently planned". These findings were made after remand of the case from the Court of Appeals where in the brief of appellees it was conceded that approval of the final design was not obtained before PPM 20–8 became effective. The district court's findings are clear that no design approval, final or otherwise, was granted at any time. Further, the ruling of this court on the interpretation of design approval finds support in Wildlife Preserves, Inc. v. Volpe, *supra*.

There is nothing in the presentation of this case to the court to support plaintiffs' contention that design approval had not occurred before the effective date of PPM 20–8. To the contrary, the record shows there is no genuine issue as to the fact that design approval was granted for the Somerville segments at the latest in June 1966 upon the approval of the basic design report and the geometric plans translating the design into the construction drawings for the segments. The modification in the design in February 1967, extending "a viaduct a distance of approximately one block", did not derogate from the basic major design features previously approved of the Somerville segments. Since design approval was granted prior to promulgation of PPM 20–8, no design hearing thereunder was required. Accordingly, neither of the defendants Volpe and Turner violated PPM 20–8 when they gave approval to the plans, specifications and estimates of I–93 after January 14, 1969. Further, the record of

the case shows that the Massachusetts Department of Public Works in fact gave consideration to social and environmental effects of the proposed highway, and to alternative designs for various elements in the highway project before the basic design report and the geometric plans were approved.

### E. *Laches*

■ Although the foregoing disposes of the case, one further issue—that of laches—merits comment. The action was filed in this court on July 6, 1970. At that time eight per cent of the construction had been completed. At the time of the hearing of the motion for preliminary injunction probably twenty per cent of the work on the DeMatteo contract had been completed. Before the action was filed, plaintiffs knew of the location of the highway, of which they raise no objection, and knew of the approval of the construction plans, specifications and estimates by December 1969, and the invitation for bids for contracts by Janary 1, 1970.

There was no unreasonable delay on the part of the plaintiffs in bringing the action under the circumstances. Obviously, there was no change of position on the part of any defendant which could be said to be caused by anything done or omitted by the plaintiffs. Their challenge is addressed to the design features of the highway, and the decisions and approvals related thereto, not to its location. The questions whether there was unreasonable delay, and whether there was prejudice, must be considered in light of what was known or reasonably could be known of the design decisions applicable to the highway, and what remedies were available to plaintiffs to challenge the defendants in respect thereto. While it can be argued that knowledge of site preparation is notice of coming events, on this record the notice is shadowy. Indeed, it was not until approval of the construction plans, specifications and estimates was known that plaintiffs can be said to have had notice of the highway design, and that they could seek

relief against defendants. If it can be said that prejudice resulted from the delay until July 6 to bring the action, because of moneys expended on the project, the federal defendants have shown no prejudice. And the other defendants have not shown that their expenditures for work done was not solely related to the highway location. The court finds the plaintiffs not guilty of laches in bringing the action.

### F. *Conclusion*

On the pleadings, depositions, affidavits, and stipulation the state defendants have a complete defense to this action on the ground of governmental immunity of the Commonwealth. There is no genuine issue as to any material fact on which defendants rely in support of their motions for summary judgment. The plaintiffs are not entitled to the relief sought on the grounds they advance. Their motions for summary judgment are denied. The motions of the defendants for summary judgment are granted.