COMMITTEE TO STOP ROUTE 7 et al.

v.

John A. VOLPE, as Secretary of Transportation, et al.

Civ. A. No. 15054.

United States District Court, D. Connecticut.

July 7, 1972.

Haynes N. Johnson, Alphonse R. Noe, Stamford, Conn., for plaintiffs.

Clement J. Kichuk, Asst. Atty. Gen., Henry Cohn, Asst. U. S. Atty., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is a suit for declaratory and injunctive relief to block construction of a highway for failure to prepare an environmental impact statement (E.I.S.) as required by the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 et seq. The highway is a 31-mile, four-lane limited access expressway to replace U. S. Route 7 from Norwalk to New Milford, and perhaps eventually on to the Massachusetts line. Plaintiffs are individuals residing in Wilton in the im-

mediate area of the proposed expressway and an unincorporated association of Wilton residents, many of whom live in the affected area. Defendants are the Secretary of the U. S. Department of Transportation (DOT), the Division Engineer (for Connecticut) of the Federal Highway Administration (FHWA), and the Commissioner and Deputy Commissioner of the Connecticut Department of Transportation (CONNDOT).

■ Jurisdiction is asserted on a number of grounds, including 28 U.S.C. § 1331, which is sufficient. Scherr v. Volpe, 336 F.Supp. 882 (W.D.Wis.1971). No challenge has been made to the standing of the plaintiffs. Testimony, affidavits and exhibits were received at a hearing on June 14, 1972.

In Connecticut, U. S. Route 7 is a main north-south artery on the western side of the state. In 1957, state legislative action was taken to plan for the construction of a new expressway to replace Route 7 from Norwalk to New Milford. The state estimates the total cost will be approximately $200,000,000. The state has authorized bonds for the expressway and undertaken extensive planning for it. The expressway will qualify for 50-50 federal funding as part of the system of primary routes, including such routes within urban areas. The state expects to use some $25,000,000 of its apportionment of federal funds on selected segments of the expressway. Federal funds have already been used for one segment in Norwalk and to construct interchanges on Interstate 84 in Danbury, an east-west highway, to which relocated Route 7, if built, will link up from the south just west of Danbury, and from which it will continue north from a point just east of Danbury.

Only the one segment at the southern end, from Interstate 95 to New Canaan Avenue in the town of Norwalk, has been built. While this segment will serve as the initial leg of the new expressway if it is eventually built, no claim has been made, nor does the evidence establish that this segment has utility only upon completion of the expressway. From all that appears, this segment has a utility of its own, even if no further construction were to occur.

The segments of the proposed expressway immediately at issue in this case are projects 161–86 and 161–93 in the town of Wilton, planned to run northerly for 3.1 miles from a point on existing Route 7 just south of Wolfpit Road to a point just north of Olmstead Hill Road at a cost of $26,000,000. The southern end of these projects is 3.8 miles north of the completed segment in Norwalk. These two projects have progressed through a series of planning, public hearing, and design steps, though no construction has begun. A hearing, which under present regulations would be considered a corridor hearing, was held on May 21, 1964. A design hearing was held on December 3, 1969. Design approval was officially given by the FWHA on March 31, 1970. Federal funding for right of way was approved on January 5, 1970, and for construction on April 19, 1972. Right of way has been acquired. Plans, specifications and estimates (PS &E) were approved by the FHWA on March 3, 1972, for 161–86, and on March 8, 1972, for 161–93. Bids for construction were opened on June 7, 1972, and the date for acceptance by the state is July 22.

To date no environmental impact statement has been filed with respect to any portion of the proposed new Route 7. A draft statement has been prepared by the state with respect to project 161–87, a three-mile segment running from Olmstead Hill Road north to the Wilton-Ridgefield town line. No draft statement has been prepared with respect to projects 161–86 or 161–93.

I

*Requirement of an Impact Statement*

Plaintiffs' essential complaint is the failure of defendants to have prepared the detailed environmental impact statement required by § 102(2) (C) of NEPA, 42 U.S.C. § 4332(2) (C). Defendants concede that projects 161–86

and 161–93 are "major Federal actions significantly affecting the quality of the environment" within the meaning of § 102(2) (C). As such the clear mandate of Congress requires an impact statement. Defendants contend nevertheless that these projects do not require compliance with NEPA because of the extensive planning and design work that preceded the effective date of the Act, January 1, 1970. The issue raised requires determination of when the Act applies.

■ An impact statement must precede "every recommendation or report on proposals" for major federal actions like these highway projects. 42 U.S.C. § 4332(2) (C). Not every step taken in the long history of the planning and construction of a highway can be considered a "recommendation or report" on a proposal for such a project. However, it seems obvious that NEPA procedures should be employed prior to any federal decision as to whether and where to build a highway. The difficulty is that several decisions are made as to location as the proposal becomes more specific.[1] Initially there is a decision as to the appropriate corridor and a route line within the corridor. Next comes a decision as to the design of the highway along that route. Finally there is a decision on the precise plans and specifications for constructing the highway in accordance with the approved design. Under current DOT regulations an impact statement must be prepared during the time when the state highway department is studying a proposed location or corridor, DOT Policy and Procedure Memorandum (PPM) 90–1, par. 6.b., and a new or supplemental statement

must be prepared during the subsequent process of decision-making whenever "the proposal being processed introduces a new or changed environmental effect of significance to the quality of environment." PPM 90–1, par. 6.p.(1).

■ With respect to the two projects challenged in this case, the first federal decision-making that occurred after the effective date of the Act was the granting of design approval by the FHWA on March 31, 1970. Moreover, since the concept of corridor approval was not introduced until 1969 by PPM 20–8, long after the state had determined the corridor in 1964, design approval was the first federal decision-making on any aspect of the specific route for these projects. Clearly this was a decision that should have been preceded by NEPA compliance.

■ Defendants seek to avoid the application of NEPA to the March 31, 1970 design approval on two grounds. First they argue that the "equivalent" of design approval occurred prior to January 1, 1970. Their theory is that at some point in 1967, the state planning and design work had progressed to the point where design approval *could* have been obtained.[2] They rely on paragraph 5.e.(1) of PPM 90–1, which specifies how design approval is to be retroactively determined in cases that arose before 1969, when PPM 20–8 first prescribed design approval. According to paragraph 5.e.(1), "design approval was that action or series of actions by which the FHWA indicated to the HA [State Highway Agency] that the essential elements of the highway as set out in paragraph 10 of PPM 20–8 were satisfactory or accept-

---

1. For a detailed explanation of the complicated and sometimes contradictory steps taken in the course of highway construction approval, see Peterson and Kennan, "The Federal-Aid Highway Program: Administrative Procedures and Judicial Interpretation," 2 E.L.R. 50001 (1972).

2. The affidavit of the division engineer states: "the plans for these projects had progressed to a point that design approval, formally documented by 2 items of cor-

respondence dated March 31, 1970 . . . to meet the specific requirement of paragraph 10 of PPM 20–8, could have been given much earlier to satisfy the concept of design approval as defined in PPM 90–1. The approximate actual date of design approval would more nearly be the date of State design approval, mid-1967 . . . ., subject to the presentation to FHWA of acceptable documentation."

able for preparation of the PS&E." The flaw in the argument is simply that back in 1967 the FHWA gave no such indication to the HA. What happened in 1967 was *state* design approval. The whole point of NEPA is that certain careful considerations respecting the environment are to be weighed before *federal* decision-making occurs. That decision-making occurred in this case on March 31, 1970. It would be administrative legerdemain to permit NEPA to be deemed inapplicable to these projects because decision-making that occurred when NEPA was in effect might have been but was not taken at an earlier time when NEPA was not in effect. Even if such a theory were tenable, the evidence here does not support the claim that the state design work in 1967, though significantly under way, was sufficient for the preparation of PS&E. The clearest indication of this is the fact that the state did not take advantage of paragraph 5.e.(1) of PPM 90–1, which allows a state to send to the division engineer a "design concurrence letter," specifying the pre-1969 documents or actions "which it believes are equivalent to design approval." Finally, the attempt to rely on the date design approval could have been given would subvert the hearing requirements of 23 U.S.C. § 128. A design public hearing on these projects was held on December 3, 1969. On March 24, 1970, a memo was sent to the state highway commissioner providing him with the comments from that hearing so that he could decide whether or not the route should be altered. Defendants cannot now claim that design approval could have been given in 1967 when in 1970 the state was still weighing public reaction to the design proposal, as it was required by law to do.

■ Defendants' second effort to avoid application of NEPA to the March 31, 1970, design approval decision is based on paragraph 5.a. of PPM 90–1, which purports to render NEPA inapplicable to projects that received design approval prior to February 1, 1971.[3] While regulations promulgated by those charged with enforcing a statute are entitled to careful consideration, Thorpe v. Housing Authority, 393 U.S. 268, 276, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Power Reactor Development Co. v. Int'l Union of Electrical, Radio and Machine Workers, 367 U.S. 396, 408, 81 S.Ct.

3. This provision of PPM 90–1 can best be understood in light of prior regulations concerning design approval. Prior to the enactment of NEPA, the pertinent U. S. DOT regulation was PPM 20–8, issued January 14, 1969. PPM 20–8 established "design approval" as a formal step in the long gestation period of highway creation. Design approval was to be given by the FHWA division engineer after a series of prior steps had been taken, including request by the state highway department for such design approval. PPM 20–8, par. 10. After the enactment of NEPA, the FHWA issued on November 30, 1970, a Draft Instructional Memorandum (IM) concerning implementation of NEPA's impact statement requirement. Paragraph 4.b. of the IM purported to postpone the effective date of § 102(2) (C) for at least thirteen months; it simply declared that the IM procedures for complying with NEPA do not apply to any project that received design approval prior to February 1, 1971. However, if such a project was on a "new location" and required "additional right of way over at least 50% of its length," then paragraph 4.c. of the IM required a "reassessment" by the state highway department, in consultation with the division engineer, to determine if the project was "developed in such a manner as to minimize adverse environmental consequences." Finally, on August 24, 1971, the U. S. DOT issued PPM 90–1, a comprehensive regulation concerning the implementation of NEPA and other environmental legislation. PPM 90–1 essentially formalized the IM of November 30, 1970. In paragraphs 5.b. and c. it too purported to exempt from NEPA's impact statement requirement any project which had received design approval prior to February 1, 1971, subject to the reassessment procedure of the IM. PPM 90–1 also provided more guidance on what constituted design approval. Paragraph 5.e. defined this step as not only the formal FHWA approval contemplated by PPM 20–8, but also informal approval given by the FHWA, prior to the date of PPM 20–8, indicating that the "essential elements of the highway were satisfactory or acceptable for preparation of the PS&E."

1529, 6 L.Ed.2d 924 (1961), that principle has more application to agency interpretation of statutory language than to agency determination of when a statute becomes applicable. This attempt to postpone the effective date of NEPA by thirteen months is contrary to the words and spirit of the legislation and cannot be permitted to stand. Certainly Congress was aware that all sorts of projects were in various stages of planning and design in 1969 when NEPA was passed. It would have been very simple for Congress to specify that the impact statement requirement of § 102(2) (C) shall not apply to projects that had reached a specified level of design progress by a specified date. But Congress declined to do so. It chose to set as a blanket effective date for the Act January 1, 1970. The evident purpose was to require all federal agencies which had not approved major federal projects by that date to withhold any future approval until the impact statement procedure had been followed. The thirteen-month exception defendants now urge is not in the statute, and it is no business of an agency or a court to put it there. Moreover, Congress expressed a clear judgment that the policies of the Act, which require careful consideration of environmental factors, should be implemented to the "fullest extent possible." 42 U.S.C. § 4332(1). To permit the exception for which defendants contend would repudiate this legislative mandate.

The case law is in accord with this conclusion. Impact statements have three times been required where design approval was given after January 1, 1970, but before February 1, 1971, Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Conservation Society of Southern Vermont v. Volpe, 343 F.Supp. 767 (D.Vt. 1972) (decision of Circuit Judge Oakes); Nolop v. Volpe, 333 F.Supp.

1364 (D.S.D.1971); *see also* Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal.1972) (dictum). Judge Oakes rejected "out of hand" the attempt of DOT to postpone the effective date of NEPA by regulation. He said he assumed "of course" that impact statements are required for any project which did not receive design approval until after the effective date of NEPA.[4] Two courts have even required an impact statement where design approval occurred before January 1, 1970, Conservation Society of Southern Vermont v. Volpe, *supra* (as to some projects); Morningside-Lenox Park Assn. v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971), though other courts have found NEPA inapplicable in such circumstances. Elliot v. Volpe, 328 F.Supp. 831 (D.Mass.1971); Penn. Environmental Council v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970), aff'd 454 F.2d 613 (3d Cir. 1971); Monroe County Conservation Council v. Volpe, 2 E.L. R. 20015 (W.D.N.Y.1971); Robinswood Community Club v. Volpe, Civ. No. 9619 (W.D.Wash. Apr. 21, 1972).

The Second Circuit has not yet ruled on the validity of the effective date postponement provision of PPM 90-1, but its attitude seems fully foreshadowed by the decision in Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972). The court stated that "there can be no question that the Act applies to all major federal actions taken after January 1, 1970." 455 F.2d at 424. The court said this was so, even if construction had started, citing with approval Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). In *Greene County* the Court of Appeals construed NEPA to require an impact statement as to a power line for which construction approval had been applied for on November 24, 1969, based on a

---

4. The weighing-of-factors approach to determine NEPA applicability, which defendants urge upon this court, was employed by Judge Oakes only with respect to projects that had received design approval *before* January 1, 1970. Such was also the case in Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal. 1972).

license previously approved by the F.P.C. on June 6, 1969. 455 F.2d at 416. The F.P.C. had not taken any action to approve the specific line prior to January 1, 1970. Even as to two other lines approved by the Commission on April 10, 1970, the Court of Appeals weighed carefully the need for an injunction for non-compliance with NEPA. An injunction was refused because these lines were 80% complete, the plaintiff had failed to exercise an opportunity to challenge these lines in an administrative proceeding in which they had intervened, and the F.P.C. had made its own independent investigation of alternative routings. 455 F.2d at 425.

In this case, no construction of the projects has occurred, there was no administrative proceeding in which plaintiffs could have challenged the federal approvals, and the U. S. Department of Transportation has made no independent investigation of alternative routes. The situation here is thus far more analogous to the Leeds line in *Greene County,* which was enjoined, than to the New Scotland and Fraser lines which were not enjoined.

■ A conclusion that NEPA required an impact statement prior to design approval for these projects does not automatically result in the issuance of an injunction. Certainly if, despite design approval after January 1, 1970, construction were now nearly completed, the equities would not favor an injunction. But where an important provision of federal law has not been complied with, the burden should be upon those urging that non-compliance should be excused. In this case no irrevocable action concerning these projects has been taken. No construction has occurred. While bids have been received, the date for acceptance has not arrived; so no contractual rights have vested. Defendants

assert as equities the extent of environmental consideration already given by the state officials, and the possible added expense due to inflation and the possible safety hazards that may ensue if there is a delay in construction.

■ This court declines to accord much weight to these factors because whatever validity they might have rests on a totally erroneous conception of one of NEPA's essential purposes. NEPA is designed to assure not merely that a major federal action will be taken with minimum damage to the environment. It also requires an agency decision, informed as to all pertinent environmental factors, as to whether or not a major federal action should be taken at all. *See* Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827 (D.C.Cir. 1972). Many who have quoted Judge Eisele's pertinent remark that "at the very least, NEPA is an environmental full disclosure law," Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749 (W.D.Ark.1971), have failed to emphasize his first four words. If the Act is seen as requiring only full disclosure, it will simply become a minor nuisance for agencies, imposing one more obligation of paperwork before they can get on with the projects they intend to build.[5] That approach will simply pave (or at least litter) the road to environmental chaos with the full disclosures of countless impact statements. Yet it was Judge Eisele who found deficient an impact statement concerning a dam on a river because it failed to consider the alternative of leaving the river alone. 325 F.Supp. at 761.

When defendants ask me to weigh the possibility of increased cost of construction if these projects are delayed, they are assuming that the projects will be built, and that the preparation of an impact statement will have no effect what-

5. This view is explicitly set forth, for example, in the following excerpt from a memorandum in evidence from one FHWA official to another discussing the preparation of an impact statement for project 161–87, immediately to the north of the projects in this litigation: "the subject project would be delayed if it were necessary to develop an EIS for a longer segment and recirculate it before preparing the Final."

ever on the decision whether or not to build. I cannot accept that assumption, nor should it be put forth by those who have the obligation under this Act to make a good faith decision about the projects after, not before, preparing and considering an impact statement. As for the possibility of traffic hazards if delay ensues, the claim is not solidly supported, and in any event, it is highly speculative whether hazards would be more reduced by a new expressway or by reconstruction and improvement of the existing route.

Similarly, the weight to be given the state's commendable prior consideration of environmental effects is diminished because that consideration was made on the assumption that the expressway would be built. Under PPM 90–1, par. 5.c., and the predecessor IM, under which the state's reassessment was made, the state is told to reassess not the fundamental decision of whether to build the project, but only "if the highway plans were developed in such a manner as to minimize adverse environmental consequences." A second look by the state as to whether environmental damage has been minimized cannot be a substitute for a first look by the agency obligated by federal law to determine whether the environment should be damaged at all.

Against these considerations, the plaintiffs have demonstrated, and the defendants have conceded, that in fact the proposed new expressway will have a major impact on the environment. It could hardly be otherwise when it is proposed to run a four-lane expressway through miles of virgin woods and wetlands. Plaintiffs have made a sufficient showing to demonstrate that the alternative of no expressway must be considered in view of the possibilities of rail transit and improvement of existing Route 7, and that even if a new expressway is to be built, alternative routes and alternative designs of the proposed route that might avoid above-grade construction must be considered. A properly prepared impact statement is the procedure

Congress has required for federal decision-making concerning these alternatives. In the ultimate weighing of the values involved in protecting the environment and meeting society's demands for "progress," the courts cannot strike the balance. But they can and must insist that the appropriate administrative officials use the scales prescribed by Congress with a scrupulous regard for the importance of the awesome choices presented. On balance, the equities justify the issuance of an injunction against all further action until there has been compliance with NEPA.

Since an impact statement will be required, it is appropriate to rule on two other issues raised by the plaintiffs, the appropriate length of highway the statement should cover, and the appropriate agency to prepare the statement.

## II

### *Appropriate Length of Highway Covered by Impact Statement*

No impact statement has been prepared for projects 161–86 or 161–93, but plaintiffs are concerned that if a statement is required by this court, defendants will prepare one solely with respect to the 3.1 miles to be included in those projects. A basis for this concern is the draft statement already prepared by CONNDOT for project 161–87, directly north of 161–86. This draft statement covers only the three-mile segment included within 161–87. While determination of the appropriate length of highway to be covered by an impact statement would normally be made in the first instance by the responsible agency, subject to judicial review, it seems only fair to the parties here to indicate now what minimum length of highway must be covered before this court will consider NEPA complied with for purposes of this litigation.

Though plaintiffs have not cited any decision where a court was required to determine the appropriate length of highway to be covered by an impact statement under NEPA, they do rely on

decisions which make it clear that consideration of environmental factors must be given to an entire power project for purposes of NEPA, Greene County v. F. P. C., *supra*, and to substantial highway lengths for purposes of related planning requirements, Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971); Morningside-Lenox Park Assn. v. Volpe, supra; D. C. Federation of Civic Assns. v. Volpe, 316 F.Supp. 754 (D.D.C.1970); Citizens Committee for Hudson Valley v. Volpe, 302 F.Supp. 1083 (S.D.N.Y. 1969), aff'd 425 F.2d 97 (2d Cir.), cert. denied 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970).

▪ If an impact statement is prepared with respect to a small length of a proposed highway, NEPA's requirements of adequate consideration of alternatives cannot be complied with. 42 U.S.C. §§ 4332(2) (C) (iii) and 4332(2) (D). With respect to a proposed highway, consideration of alternatives has two dimensions: an initial choice between building the highway or relying on existing routes or alternative means of transportation, and a subsequent choice among various alternative routes and designs. Consideration of the environmental impact of a small segment of a proposed route makes impossible adequate consideration of either set of choices. Alternatives to building an expressway are not brought into focus when consideration is given to just one segment. Moreover, placement of one segment tends to narrow the range of choices for placement of the remainder of the entire highway, thereby precluding adequate consideration of alternative routes.

The necessity for impact statements to cover adequate lengths of proposed highways to meet the requirements of NEPA has been recognized in paragraph 6 of PPM 90-1:

"The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program."

▪ While no precise mileage for an appropriate length can be specified, the test is whether the length selected assures adequate opportunity for the consideration of alternatives (both whether and where to build) required by the Act. The 3.1 miles of projects 161–86 and 161–93 within the town of Wilton are inadequate for these purposes, as are the 3 miles of project 161–87 in Wilton which is the subject of the draft statement.

▪ Determination of the appropriate length depends in the first instance on the nature of the proposal. If the proposal is to build an expressway from Norwalk to New Milford (and there is substantial evidence to indicate this is the plan), then these points determine the proper scope of an impact statement. However, it also appears that one of the objectives which the planners have in mind is to connect by an expressway the communities of Norwalk and Danbury. To the extent this is the proposal, an impact statement should cover these points. A statement covering a longer span extending all the way to New Milford might become involved with alternative routes that bypass Danbury completely. The appropriate length obviously need not be so extended that consideration of alternatives overlooks a major objective of building the proposed highway. In this case, a minimum length would thus appear to be from Norwalk to Danbury. Any longer span is within the discretion of the responsible officials. Of course, if an impact statement covers a long span, it may become necessary at a later stage to prepare a statement for a short span if the routing or design of that

short span involves environmental considerations not adequately considered in the initial statement.

## III

### *Appropriate Agency to Prepare Impact Statement*

■ PPM 90–1, pragraph 6, provides that the state highway department shall prepare both a draft and a final environmental statement for review and acceptance by the FHWA. Defendants assert this is a reasonable means of carrying out NEPA, which they claim has been approved in Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971), and Pizitz, Inc. v. Volpe, Civ. No. 3595–N (M.D.Ala. May 1, 1972). The issue is not mentioned in *Pizitz*, and in *Lathan*, the court observed that neither the federal nor the state defendants had submitted impact statements. 455 F.2d at 1121. It thus appears that *Lathan* may leave to the state highway department not the entire responsibility for preparation of impact statements, but simply the role of preparing a draft statement. The distinction has been considered critical by the Second Circuit in *Greene County*. The Court of Appeals acknowledged that the applicant could prepare a draft statement which the F.P.C. could use to seek the views of other federal agencies. 455 F.2d at 422. But as to the final version of the detailed statement required by § 102(2) (C), the Court of Appeals ruled unequivocally that this must be prepared by the F.P.C. itself, with the actual work to be done by the agency's own staff. This was held to be a requirement of the statute, and there is no more basis for the statute to be altered by the regulation of the FHWA here than by the F.P.C.'s interpretation of the guidelines of the Council on Environmental Quality in *Greene County*. 455 F.2d at 421.

In fact, the very same danger of self-serving assumptions that concerned the Court in *Greene County* is present here. Like the Power Authority of the State of New York, the Connecticut Department of Transportation has already concluded in the draft statement on project 161–87 that the project "will probably not significantly affect the quality of man's environment," even though what is proposed is a segment of a new four-lane expressway of a total length of at least 30 miles. *Cf.* 455 F.2d at 420.

In this case, federal officials must prepare the final version of the impact statement as required by the plain wording of NEPA.[6]

## IV

### *Other Matters*

■ Two other matters may be briefly noted. The proposed route of project 161–86 requires the taking of 3.5 acres of the Wilton Community Park, and the proposed route of project 161–87 will run though Camp Lowell, a Girl Scout camp. Pursuant to § 4(f) of the Department of Transportation Act of 1966, as amended by § 18(b) of the Federal Highways Act of 1968, 49 U.S.C. § 1653 (f), the Secretary of Transportation on March 31, 1972, made a finding that there is no feasible and prudent alternative to the proposed taking of a portion of the Wilton Community Park. Consideration is currently being given to a

6. Since plaintiffs in this suit have challenged only whether state officials may prepare impact statements, it is not necessary to decide now upon which federal officials the responsibility rests. *Cf.* Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972). All parties seem to have assumed that of the federal agencies, the appropriate agency would be the Federal Highway Administration. They may be correct, though perhaps some consideration ought to be given to whether the appropriate agency is the parent U. S. Department of Transportation, in view of the Congressional policy of coordinated administration of transportation programs, 49 U.S.C.A. § 1651, and the plaintiffs' claim here that rail transportation is one of the alternatives that an impact statement must seriously evaluate.

4(f) statement with respect to Camp Lowell within project 161–87. Plaintiffs challenge the 4(f) determination with respect to the Wilton Community Park on the ground that the Secretary made his finding without having before him all pertinent documentation. While there is some doubt as to the substance of this claim, it need not be considered since § 4(f) by its terms applies only to the use of "publicly owned land," and neither the Wilton Community Park nor Camp Lowell are publicly owned. The fact that the Secretary elected to give to the Community Park acreage the special consideration specified in § 4(f) does not mean his determination must be tested by the requirements of that statute if it is inapplicable by its own terms.

Plaintiffs have also asserted under pendent jurisdiction a state cause of action based on Connecticut's Environmental Protection Act of 1971, Conn.Pub. Act No. 96 (1971). Disposition of the federal cause of action makes it unnecessary to consider the appropriateness of pendent jurisdiction over the state cause of action, but it is worth noting that the court's decision, required by federal law, is in accord with the policies recently set forth by the legislature of the state.

The foregoing will serve as the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Accordingly, judgment will enter for the plaintiffs declaring that relocated Route 7 requires the preparation of an environmental impact statement by federal officials covering at least a span from Norwalk to Danbury, and enjoining defendants, their agents and employees and those persons in active concert or participation with them from taking any steps to construct any portion of relocated Route 7 until such a statement has been prepared according to the provisions of § 102(2) (C) of the National Environmental Policy Act.