**CITIZENS ORGANIZED TO DEFEND the ENVIRONMENT, INC., et al., Plaintiffs,**

v.

**John VOLPE et al., Defendants.**

**Civ. A. No. 72–289.**

United States District Court, S. D. Ohio, E. D.

Dec. 15, 1972.

Joel E. Thomas, Isaac and Isaac, Columbus, Ohio, for plaintiffs.

William Milligan, U. S. Atty., and Gary Brinsfield, Asst. U. S. Atty., for defendants Volpe and Leathers.

William Brown, Atty. Gen. of Ohio, Donald Guitar, Asst. Atty. Gen., for defendants Gilligan and Richley.

Thomas P. Mulligan, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for defendant Consolidation Coal Co.

Herbert Brown, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant Consolidation Coal Co.

## OPINION AND ORDER

KINNEARY, District Judge.

This is an action under the Federal-Aid Highway Act [hereinafter Highway Act], 23 U.S.C. § 101 et seq., and under the National Environmental Policy Act [hereinafter NEPA], 42 U.S.C. § 4331 et seq., to review decisions of the Secretary of the United States Department of Transportation concerning the construction of an interstate highway in Belmont County, Ohio and the proposed crossing of the highway by mining equipment owned and operated by Consolidation Coal Company. The Court has jurisdiction to review the actions of the Secretary, and his delegates, under the provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

This matter is before the Court on plaintiffs' motion for summary judgment, the cross-motion for summary judgment of the defendants John Volpe, Secretary of the United States Department of Transportation and Rex C. Leathers, a division engineer of the Federal Highway Administration [hereinafter Secretary Volpe and his delegates, including Mr. Leathers, will be referred to as the "Secretary" unless individually named], the cross-motion for summary judgment of the defendants John J. Gilligan, Governor of the State of Ohio and J. Phillip Richley, Director of the Ohio Department of Transportation [hereinafter Governor Gilligan, Director Richley, and their delegates are referred to as "Ohio" unless individually named], and the defendant Consolidation Coal Company [hereinafter "Consol"].

The parties have entered a stipulation of fact.[1] The relevant facts material to

---

1. Both plaintiffs and defendants objected to portions of the stipulation. The Court rules as follows on these objections as they are lettered and numbered at the beginning of the stipulation of facts filed herein:

 (a) plaintiffs' objections on grounds of relevancy
 (1) Overruled.
 (2) Sustained.
 (3) Overruled.
 (4) Sustained.
 (5) Sustained.

 Plaintiffs' unnumbered objections on the grounds of relevancy to the affidavits of the following individuals:

 Ralph W. Hatch. Sustained as to paragraphs 1–3, 5, 6. Overruled as to paragraph 4.

 Thomas J. Henderson. Sustained as to paragraph 4. Overruled as to paragraphs 1–3.

 Joseph Brown. Sustained as to paragraphs 1–5.

 Rex C. Leathers. Overruled as to paragraphs 1–8 of affidavit #9; and overruled as to paragraphs 1–6 of affidavit #14.

 Plaintiffs' unnumbered objections on the grounds of competency and lack of foundation to the affidavits of the following individuals:

 J. Phillip Richley. Sustained
 Clark Street. Sustained

 (b) Defendants make two objections:
 (i) Overruled.
 (ii) Overruled.

 Where the objection has been sustained the Court has not considered the facts

the legal issues herein are uncontroverted. Summary judgment is proper under the provisions of Rule 56 of the Federal Rules of Civil Procedure.

The Court will first set out a brief summary of the uncontroverted facts. Then there will be a short discussion of the scope of review. Thereafter, the Court will discuss and determine the Highway Act claim for relief, the pendent Ohio law claim, and the NEPA claim.

## FACTS

Interstate 70 is a limited access, divided highway which is a part of the interstate highway system connecting major American cities; and it is a part of the Ohio highway system. Twenty-seven miles of I–70 travel through Belmont County, Ohio. The posted speed limits are 70 miles per hour for automobiles, and 55 miles per hour for trucks. I–70 is specifically designed to safely accommodate such traffic flow at such speeds.

In 1964, Consol owned or had mining interests in an area known as Egypt Valley in Belmont County, Ohio. Part of Consol's land in Belmont County, Ohio was in the path of the proposed route of I–70. The State of Ohio attempted to negotiate with Consol for the necessary right-of-way for the part of I–70 which divided the Egypt Valley coal field. Consol claimed damages caused by the dividing of its coal field by I–70 in a total amount of 8–10 million dollars. Ohio agreed with Consol to construct two underpasses under I–70 to permit Consol's coal trucks to pass under I–70 and agreed to permit Consol to cross over I–70 with mining equipment 10 times during a period of 40 years.[2]

The Secretary approved this agreement by a letter of September 3, 1964.[3]

On November 12, 1964, the State of Ohio and the Department of Commerce [now the Department of Transportation] entered a project agreement for the construction of I–70. The project agreement contained a paragraph approving the right-of-way with a reservation by Consol of a right to cross I–70 10 times during a period of 40 years.[4]

Construction of I–70 in Belmont County began in 1964. It was completed no later than the end of 1968.

On January 28, 1972, Consol requested Ohio's permission to cross I–70 pursuant to the 1964 agreement. Ohio gave its approval on March 6, 1972. The Secretary of Transportation approved the crossing plans on April 14, 1972.

A permit was issued on August 7, 1972 for the crossing of I–70 by the GEM strip mining shovel. On September 29, 1972, Consol requested Ohio to amend the crossing permit to substitute instead of the GEM the strip mining shovel known as the Mountaineer and the strip mining shovel known as the 46A shovel.

The crossing plans call for the rerouting of traffic off I–70 for approximately 1¼ miles around a causeway over which Consol will move its shovels over the highway. Temporary cross-over entrance and exit ramps will be constructed. They will connect with State Route 800. Traffic will thus flow for approximately 1¼ miles from I–70 onto exit ramps to State Route 800 onto entrance ramps and back to I–70. Uniformed flagmen will be stationed to direct traffic through the bypass. Other safety precautions will be taken including grading of the ramps to engineering specifications and signing of the detour.

To protect the pavement during the shovels' crossing a minimum of six feet of crushed stone and earth will be placed over the road. Heavy wooden mats would then be placed over the crushed stone and earth.

---

contained in the stipulation, affidavit or document in ruling on the motions for summary judgment.

2. The two underpasses for coal hauling trucks were constructed in 1964 and 1965

as part of the I–70 highway project. None of the 10 proposed crossings of I–70 have been made.

3. See fn. 25 post, at p. 34.

4. See fn. 26 post, at p. 35.

The proposed crossing would take approximately 24 hours.

The Department of Transportation has made a determination that the review and approval of the crossing plans submitted by Consol does not constitute major federal action which makes the National Environmental Policy Act of 1969 applicable.

## SCOPE OF REVIEW

■■■ Review of federal administrative decisions is governed by the Administrative Procedure Act, 5 U.S.C. § 701 et seq., unless the decision is committed by law to agency discretion. 5 U.S.C. § 701(a)(2).[5]

■■■ Acts are committed to agency discretion only in the exceptional circumstance where statutes are so broadly drawn that there is no law to apply. Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The actions of the Secretary to be reviewed were not committed entirely to his discretion, and they are, therefore, subject to review.[6]

Section 706 of the Administrative Procedure Act provides that:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

The Secretary's decision is entitled to a presumption of regularity, "[b]ut that presumption is not to shield his action from a thorough, probing, in-depth review." Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. supra at 415, 91 S.Ct. at 823.

In reviewing the Secretary's decision the Court must make the following determinations:

1. What is the scope of the Secretary's authority?

2. On the facts, was the Secretary's decision reasonably within the range of his authority?

3. Was the decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?" 5 U.S.C. § 706(2)(A).

---

5. Reviews of decisions of the Secretary of Transportation are unquestionably governed by the Administrative Procedure Act. 49 U.S.C. § 1655(h). Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

6. The Highway Act claim arises under legislation which gives the Secretary very

broad, sometimes discretionary, powers. However, there are some statutory limitations, and some limitations imposed by the Secretary's own regulations. It is the Court's duty to construe these statutes and regulations, to determine the legal limits of the Secretary's authority.

4. Did the Secretary follow the necessary procedural requirements.[7]

Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. *supra* at 415–416, 91 S.Ct. 814.

■ One final caveat must be clearly stated in connection with judicial review of administrative actions. The Court does not act in place of the administrator. As the Supreme Court noted in Citizens To Preserve Overton Park, Inc. v. Volpe, 410 U.S. *supra* at 416, 91 S.Ct. at 824:

Although [the Court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

The legality, not the wisdom, of the Secretary's actions is at issue.

## HIGHWAY ACT

Plaintiffs contend that under the provisions of the Highway Act the Secretary was not empowered to authorize Consol to cross over I–70 with mining equipment 10 times during a period of 40 years. Plaintiffs advance two arguments in support of this position. Each will be considered in turn.

A. The Highway Act does not authorize a special non-highway use of any part of the federal interstate highway system which is not specifically provided for in the Act.

This argument rests upon the principle of statutory construction that when a legislative body circumscribes administrative authority with detailed limitations on its exercise, administrative authority is limited to powers expressly conferred or necessarily implied. *See, e. g.,* Youngblood v. United States, 141 F. 2d 912, 913 (6th Cir. 1944); United States v. Foster, 131 F.2d 3, 7 (8th Cir. 1942), cert. denied, 318 U.S. 767, 63 S. Ct. 760, 87 L.Ed. 1138 (1942).

This rule of construction does not apply to this case. The Highway Act is not a narrowly drawn statute which carefully delimits the Secretary's duties. On the contrary, the Secretary's authority under the Highway Act to approve and finance highway construction is a grant of broad, often discretionary, powers to effectuate the purposes of the Act. The Secretary's authority is not merely ministerial.

■ The Court holds that the Highway Act's failure to expressly provide for an extraordinary crossing of an interstate highway is not dispositive on the issue of the Secretary's authority under the Act to agree to permit such crossings.

B. The Highway Act expressly prohibits any special non-highway use of the interstate system which would interfere with the free flow of traffic.

The Highway Act is a multibillion dollar, long term, federal funding program to pay a portion of the construction costs of highways designated a part of the federal-aid highway systems.[8] The funding was established and continues because Congress determined that "such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense." 23 U.S.C. § 101(b).[9]

---

7. This question has not been raised in relation to the Highway Act claim for relief. The fourth inquiry is the sole issue in relation to the National Environmental Policy Act claim for relief.

8. There are four federal-aid highway systems: the federal-aid primary system, a system of connected main highways not exceeding seven per centum of the total highway mileage of a participating state; the federal-aid secondary system, a system of highways not included in the federal-

aid primary or the interstate systems; the federal-aid urban system, a system established in each urbanized area to serve major centers of activity; and the interstate system, a system of highways connecting the principal metropolitan areas, cities and industrial centers, serving the national defense, and connecting with continental routes on the Canadian and Mexican borders. See, 23 U.S.C. § 103.

9. Other articulated interests or purposes of the legislation are: highway safety, 23

The Highway Act calls for a multi-step planning and program agreement process. Initially, the State highway department selects a route which must be approved by the Secretary. 23 U.S.C. § 103(d), (e)(1). Next, the State submits a program for the construction of highways included within the federal-aid systems. The Secretary may then "approve a program in whole or in part." 23 U.S.C. § 105.

If the Secretary gives his approval under 23 U.S.C. § 105, the State submits surveys, plans, specifications and estimates for the program. The Secretary's approval of the State's surveys, plans, specifications and estimates constitutes a contractual obligation of the United States. 23 U.S.C. § 106.

Following program approval, the State and the Secretary execute a formal project agreement covering the construction, operation and maintenance of the project. 23 U.S.C. §§ 109, 110.

Plaintiffs contend that a limitation on the Secretary's authority to approve State highway programs and projects, contained in 23 U.S.C. § 111, prohibits the Secretary from authorizing the crossing of I–70. Section 111 provides:

*Agreements relating to use of and access to rights-of-way—Interstate System*

All agreements between the Secretary and the State highway department for the construction of projects on the Interstate System shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary in the plans for such project, without the prior approval of the Secretary. Such agreements shall also contain a clause providing that the State will not permit automotive service stations or other commercial establishments for serving motor vehicle users to be constructed or located on the rights-of-way of the Interstate System. Such agreements may, however, authorize a State or political subdivision thereof to use or permit the use of the airspace above and below the established grade line of the highway pavement for such purposes as will not impair the full use and safety of the highway, as will not require or permit vehicular access to such space directly from such established grade line of the highway, or otherwise interfere in any way with the free flow of traffic on the Interstate System.

Plaintiffs argue that the limitations of Section 111 are made explicit in the regulation promulgated by the Secretary in 23 C.F.R. § 1.23 (1972):

(a) *Interest to be acquired.* The State shall acquire rights-of-way of such nature and extent as are adequate for the construction, operation and maintenance of a project.

(b) *Use for highway purposes.* Except as provided under paragraph (c) of this section, all real property, including air space, within the right-of-way boundaries of a project shall be devoted exclusively to public high-

---

U.S.C. §§ 101(a), 105(f), 109(a), (d), (e), (f), 116; conformity to the particular needs of each locality, 23 U.S.C. § 109(a); the creation of an efficient transportation network, 23 U.S.C. §§ 101(b), 103(e)(1), 105(c), 109(b); to provide direct and convenient access to public facilities, 23 U.S.C. § 105(g); and that the systems be expeditiously and economically constructed, 23 U.S.C. § 108(a). Commencing in July, 1972, the Secretary is required to consider the following before approving projects:

(1) air, noise, and water pollution;

(2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;

(3) adverse employment effects, and tax and property value losses;

(4) injurious displacement of people, businesses and farms; and

(5) disruption of desirable community and regional growth.

23 U.S.C. § 109(h).

The Secretary must now also consider noise and air pollution when approving program plans. 23 U.S.C. § 109(i), (j).

way purposes. No project shall be accepted as complete until this requirement has been satisfied. The State highway department shall be responsible for preserving such right-of-way free of all public and private installations, facilities or encroachments, except: (1) those approved under paragraph (c) of this section; (2) those which the Administrator approves as constituting a part of a highway or as necessary for its operation, use or maintenance for public highway purposes; and (3) informational sites established and maintained in accordance with § 1.35 of the regulations in this part.

(c) *Other use or occupancy.* Subject to 23 U.S.C. § 111, the temporary or permanent occupancy or use of right-of-way, including air space, for nonhighway purposes and the reservation of subsurface mineral rights within the boundaries of the rights-of-way of Federal-aid highways, may be approved by the Administrator, if he determines that such occupancy, use or reservation is in public interest and will not impair the highway or interfere with the free and safe flow of traffic thereon.

Plaintiffs construe Section 1.23 to require the State to acquire property rights in highway right-of-ways guaranteeing that the property will be used exclusively for highway purposes. [23 C.F.R. § 1.23(b): "[A]ll real property . . . shall be devoted exclusively to public highway purposes."] The only exceptions, plaintiffs continue, are:

(1) uses for nonhighway purposes approved by the Secretary as in the public interest, which do not impair the highway or interfere with the free flow of traffic thereon. 23 C.F.R. § 1.23(c).

(2) public or private installations, facilities or encroachments necessary for the operation, use or maintenance of the highway.

(3) informational sites.

The second and third exceptions are clearly inapplicable. Thus, plaintiffs contend the only possible authority for the agreement between Ohio and Consol is contained in the first exception. 23 C.F.R. § 1.23(c).

Plaintiffs argue that the rerouting of traffic off I–70 for approximately 1¼ miles to permit two of Consol's shovels to cross I–70 is a temporary occupancy or use of the I–70 right-of-way for nonhighway purposes which is not in the public interest and which will impair the highway and interfere with the free flow of traffic thereon; and plaintiffs therefore conclude, the Secretary's approval was in contravention of the express language of 23 C.F.R. § 1.23(c).

Plaintiffs' reading of 23 U.S.C. § 111 and 23 C.F.R. § 1.23(c) is too restrictive.

On its face, 23 U.S.C. § 111 does not fetter the Secretary's discretion in approving access and exit points when passing on project plans. Rather, it forbids a State from adding access or exit points *"in addition to those approved by the Secretary in the plans for such project,* without prior approval of the Secretary."[10] [Emphasis added] There is no language in the Highway Act expressly or impliedly setting out standards governing the Secretary's approval of access and exit points.

In 1964, the Secretary gave his approval to the crossing of I–70 by Consol's mining equipment. Later, the project agreement was executed. It expressly approved future crossings of I–70. The Secretary again "approved" future crossings of I–70 when he accepted the I–70 project as completed.

None of the above actions of the Secretary could have been taken under the authority of the first sentence of 23 U.S.C. § 111; because, as noted above, § 111 only covers access or exit points "in addition to those approved by the Secretary in the plans for such project.

10. The statute contains no limitation on the Secretary's authority to grant his approval.

. . . ." The future crossings *were* approved by the Secretary when he entered the project agreement. The crossings are not an addition to the project plans.[11] Thus, the Secretary's approval was given under 23 U.S.C. § 110(a),[12] which does not expressly limit the Secretary's power to approve access and exit points.[13]

There is the following language in 23 U.S.C. § 111 which restricts the uses of a highway right-of-way that the Secretary may approve in a project agreement:

Such agreements shall also contain a clause providing that the State will not permit automotive service stations or other commercial establishments for serving motor vehicle users to be constructed or located on the rights-of-way of the Interstate System. Such agreements may, however, authorize a State or political subdivision thereof to use or permit the use of the airspace above and below the established grade line of the highway pavement for such purposes as will not impair the full use and safety of the highway, as will not require or permit vehicular access to such space directly from such established grade line of the highway, or otherwise interfere in any way with the free flow of traffic on the Interstate System.

The express statutory language prohibits only two general uses of a highway right-of-way:

1. any use for serving motor vehicle users; and

2. any use of air space which does not meet statutory standards.

In adopting 23 C.F.R. § 1.23, the Secretary has apparently construed 23 U.S.C. § 111 to be an implied expression of Congressional disfavor of all non-highway uses. Whether or not that is the case need not be decided. The Secretary clearly had the power to adopt 23 C.F.R. § 1.23 under the authority of 23 U.S.C. § 101 et seq.[14] Section 1.23 is controlling, because it is the only section of Title 23, Code of Federal Regulations, which provides standards governing use of a highway right-of-way for non-highway purposes.

There is no requirement in § 1.23, or in any other provision of the United States Code or the Code of Federal Regulations, that requires a State to acquire a fee interest in a right-of-way. All that is mandated is that:

The State shall acquire rights-of-way of such nature and extent as are adequate for the construction, operation and maintenance of a project.

23 C.F.R. § 1.23(a)

The right-of-way obtained by the State from Consol is clearly adequate for the construction and maintenance of I–70.

---

11. Additionally, the Court doubts that the reservation of right in Consol to cross the right-of-way can be classified as an access and exit point. There is no designated point, and no regular use. It would be more accurate to refer to the crossings as a "use".

12. § 110. Project agreements
(a) As soon as practicable after the plans, specifications, and estimates for a specific project have been approved, the Secretary shall enter into a formal project agreement with the State highway department concerning the construction and maintenance of such project. Such project agreement shall make provision for State funds required for the State's pro rata share of the cost of construction of such project and for the maintenance thereof after completion of construction.

13. Indeed, § 111 itself does not expressly limit the Secretary's power to approve additional access and exit points. It merely precludes a State from adding access or exit points without the Secretary's approval.

14. 23 C.F.R. § 1.23 does not state the statutory authority under which it was adopted. Decisions involving uses of rights-of-way are authorized, expressly or impliedly, by 23 U.S.C. §§ 105, 106, 107, 108, 109 and 110 as well as by 111. The regulation could have been adopted pursuant to authority granted by any one, or all, of those sections.

Plaintiffs put at issue the adequacy of the right-of-way for the operation of the project in light of the retention by Consol of a right to cross I–70.

Adequacy of a right-of-way must be determined in conjunction with the requirement of 23 C.F.R. § 1.23(b) that "all real property . . . within the right-of-way be devoted exclusively to public highway purposes," subject to three exceptions.

Consequently, if the Consol right-of-way had provided that all property within its boundaries shall be devoted exclusively to public highway purposes, it would be adequate for operation of a project. However, the right-of-way granted by Consol to the State of Ohio retains in Consol the right to cross I–70 ten times in forty years with the approval of the Ohio Department of Transportation and the United States Department of Transportation. To that extent, the right-of-way is not exclusively devoted to highway purposes. The Secretary was authorized to approve the project agreement only if the right of crossing falls within the permitted nonhighway uses.

The retention of a right of crossing is neither a part of the highway, nor an informational site, nor a reservation necessary for their operation, use or maintenance of the highway. See, 23 C.F.R. § 1.23(b). If the use is not to be precluded by 23 C.F.R. § 1.23, it must qualify under the exception set out in subsection (c).

Section 1.23(c) permits the Secretary to approve a nonhighway use if he determines that use:

1. Is in the public interest.
2. Will not impair the highway or interfere with the free and safe flow of traffic.

The question for decision is: Was the Secretary's determination that the State had acquired a right-of-way meeting the requirements of 23 C.F.R. § 1.23 either:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law. . . .

5 U.S.C. § 706 (1972). Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971).

The validity of the Secretary's decision turns on the meaning of the phrases "in the public interest" and "impair the highway or interfere with the free and safe flow of traffic." These terms are not defined in the Regulations. There are no cases construing 23 C.F.R. § 1.23. The meaning of the regulation is not clear from a reading of the regulations or the statutes which constitute the authority for the regulation. Deprived of such guideposts, the Court must consider the intent of the specific section together with the purposes of the entire statutory scheme.

Before embarking on this task, the Court notes that the statutory purposes set out below were broadly stated by Congress. These purposes are guides to the construction of a statutory scheme which contains few specific limitations on the Secretary's powers to implement the Act. The task does not become easier when it is recognized that although § 1.23 starts with a very specific injunction—no nonhighway uses shall be permitted—the prohibition is qualified by phraseology—"in the public interest"—again requiring the exercise of the broadest discretion.

Within this framework, but mindful of the United States Supreme Court's admonition in Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) that rarely is an administrative action nonreviewable because it is committed solely to agency discretion, the Court will construe § 1.23(c).

The primary purpose of the Highway Act is to provide highway transportation

systems adequate "to meet the needs of local and interstate commerce, for the national and civil defense." 23 U.S.C. § 101(b). Other interests recognized by the Highway Act are:

1. highway safety;
2. highway construction compatible with the needs of each locality;
3. the creation of an efficient highway transportation network;
4. highways that provide direct and convenient access to public facilities;
5. expeditious and economical highway construction.[15]

Each of the qualifying phrases of § 1.23—"in the public interest" and "free and safe flow of traffic"—must be examined in the light of these purposes.

■ A use is "in the public interest" if it is not inconsistent with the purposes of the Act and it either furthers some recognized public good or minimizes a public harm.

Similarly, a use of a highway "will not impair the highway or interfere with the free and safe flow of traffic thereon" if it is not inconsistent with the purposes of the Act and it does not compromise the implicit purpose of the regulation to maintain the highway in a condition which maximizes highway use. Resort to dictionary definitions of the words contained in these phrases is not dispositive. The words must be defined within the context of their normal usage in relation to highways.

■ Upon a review of the record, the Court concludes that the Secretary could reasonably have believed that the agreement permitting Consol to cross I–70 was in the public interest. The I–70 right-of-way divides the Egypt Valley coal field. Consol has mining interests on both sides of the right-of-way. During the negotiations for the acquisition of the right-of-way, Consol claimed that the taking of the right-of-way, which allegedly interfered with mining operations, would result in damages of 8–10 million dollars. The effect of the agreement between Ohio and Consol, approved by the Secretary in the project agreement, was to compromise this claim.[16] The Secretary could reasonably believe that the project agreement recognizing Consol's right to cross I–70 with mining equipment would result in a substantial savings of public funds.

■ Economical use of public funds for highway construction is one of the express interests recognized by the Highway Act. The cost of a publicly financed project has been long recognized by the courts as a factor which an administrator may consider in exercising his discretion. See, United States ex rel. T.V.A. v. Welch, 327 U.S. 546, 554, 66 S.Ct. 715, 90 L.Ed. 843 (1946); Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650, 654 (S.D.N.Y. 1967). Economical expenditure of public funds is in the public interest.

Nonetheless, the use would not be permissible under § 1.23 if it thwarted one of the purposes of the Act. Each purpose will be considered in turn in relation to the proposed use.

The crossing of I–70 by Consol's mining equipment 10 times in 40 years will not frustrate the highway's capacity "to meet the needs of local and interstate commerce, for the national and civil defense." No interstate or local commerce will be diverted from its destination. The flow of commerce will not be reduced. In fact, the Secretary could reasonably believe that by permitting Consol's mining equipment to cross I–70 the conduct of that business is permitted to continue unimpeded, thus facilitating interstate and local commerce without infringing on other predominant values protected by the Highway Act.

15. See fn. 9, *supra* at p. 526. Other legislative purposes declared after the Secretary's 1964–1965 decision to accept the project as complying with 23 C.F.R. § 1.23 are also set out in fn. 9.

16. In addition to permitting Consol to reserve a right of crossing the agreements called for the construction of two highway underpasses.

Overall highway safety is not impaired by the crossings. First, the crossings are very infrequent. Even assuming, which the Court does not, that safety levels were marginally reduced at the time of a crossing, the effect over a 40 year period would most certainly be *de minimus*. The Secretary, and the State of Ohio, have given permission to the presently proposed crossing only after establishing reasonable safety standards. The bypass will meet engineering standards established by the State of Ohio. A State Highway Patrolman will be on duty during its construction. During the 24 hour period of the crossing signs will advise motorists of the detour. Uniformed flagmen will be stationed to direct traffic through the 1¼ mile bypass. Vehicle speeds will be reduced consistent with safety.

Plaintiffs contend that the fact that traffic safety is higher on four lane freeways than on two lane secondary road, demonstrates that the two lane bypass will be inconsistent with the safety purposes of the Highway Act. These statistics are not conclusive. No statistics are offered of the accident rate on bypasses utilized when highway repairs are made. Such bypasses are analogous to the one contemplated for the mining equipment crossings.

The Secretary could reasonably believe that the crossings, employing safety standards similar to those employed during highway maintenance, are consistent with the safety purposes of the Highway Act.

The interest expressed in the Highway Act that highway construction should be compatible with the needs of each locality is not furthered or retarded by the I–70 shovel crossings. Construction of I–70 is completed and presumably it furthered the needs of the locality.

The purposes that the Highway Act facilitate construction of an efficient highway network and that the network provide direct and convenient access to public facilities are not compromised by Consol's proposed crossings of I–70. Even assuming an interference with an efficient transportation network and an impairment of direct and convenient access to public facilities, which the Court does not, such interference or impairment occurring 10 times over a period of 40 years is *de minimus*.

The Highway Act's purpose in promoting expeditious and economical highway construction has previously been discussed.

The Court concludes that the Secretary could reasonably believe that the proposed use of I–70 would not be inconsistent with the purposes of the Highway Act. Further, he could reasonably conclude, for the reasons set out above, that the reservation of a right of crossing promoted a public good—economy in the use of public funds. Therefore, the Secretary did not act arbitrarily or capriciously, nor did he abuse his discretion, when he determined that the reservation of a right to cross the highway right-of-way was "in the public interest" within the meaning of 23 C.F.R. § 1.23(c).

■ The question remains: Will the use reserved "interfere with the free and safe flow of traffic" on I–70? The Court has already concluded that the use is not inconsistent with any of the express purposes of the Act. Still to be determined is whether the use is consistent with the implied purpose of the regulation to maintain the highway in a condition which maximizes highway use.[17] That is, § 1.23 begins by prohibiting all nonhighway uses, it then permits certain, limited nonhighway uses. This mode of statement emphasizes the primary importance of the highway use, and requires a careful scrutiny of any exceptions.

■ The "free flow of traffic" as embodied in § 1.23 means a flow of traffic adequate "to meet the needs of local and interstate commerce" and implement the other purposes of the Act. The

17. See, p. 14, *supra.*

Court does not believe that the phrase means that volume of traffic, free at all times to travel at the maximum rate of speed, which can safely be accommodated during ordinary road conditions. Nor does the Court believe that the temporary closing of a short stretch of a highway and the rerouting of traffic around that section necessarily interferes with the free flow of traffic.

The operation of an interstate highway requires ongoing maintenance which necessarily results in reduced traffic speed, occasional reductions of traffic volume, and infrequent rerouting. The interference in the flow of traffic contemplated by the Secretary when he consented to the crossing of I–70 by Consol's mining equipment was of the sort associated with highway maintenance. The flow of traffic will be maintained. Adequate measures are planned to insure that traffic moves safely.

▉ In short, there will be no interference with the flow of commerce or with the primary use of the right-of-way for highway purposes. The non-highway use will not interfere with the highway use. Therefore, the Court holds that the Secretary did not act arbitrarily or capriciously, nor did he abuse his discretion when he decided that to permit Consol to reserve a right to cross the right-of-way would not impair the highway or "interfere with the free and safe flow of traffic thereon."

In summary, the broad language of the Highway Act and the ambiguous, heretofore uninterpreted limitations on the nonhighway uses of rights-of-way found in the regulations, create unusual problems of statutory construction.

The problem posed by the division of Consol's coal fields by the I–70 right-of-way was not the normal one presented when the economic interests of abutting landowners come in conflict with the public's interests in a highway transportation system. When a State takes a right-of-way for highway construction, abutting landowners are denied direct access. Any economic loss is compensable. If the taking disrupts substantial economic interests, methods of reducing damages and economic dislocation are devised. Access roads are constructed. Underpasses are built. See, State v. Williams, 207 Tenn. 695, 343 S.W.2d 857 (1961).

But Consol's economic interests in the coal fields and mining equipment could not be adequately protected by any of these techniques. Although two underpasses were constructed as part of the compensation for the taking, some of the mining equipment was too large to pass under the highway. The Secretary *could* have made the decision to prohibit any crossing of I–70 and compensate Consol for the economic loss. But he was not required to do so. The Secretary could well have considered the situation to be *sui generis*. An administrator faced with an unusual obstacle to the satisfactory completion of a public project "is not barred from making a common sense adjustment in the interest of all the public." United States ex rel. T.V.A. v. Welch, 327 U.S. *supra* at 554, 66 S.Ct. at 719.

The purpose of the Highway Act is not to disrupt local and interstate commerce. Quite the contrary, as noted above, the primary purpose of the Act is to facilitate local and interstate commerce, in the national defense. Inevitably, highway construction results in the taking of economic interests associated with land uses in the path of the highway. This subordination of the private to the common good is well established in the law of condemnation. However, there is no inexorable statutory command under the Highway Act that all economic activity abutting a highway cease if it cannot accommodate itself to an underpass.

The Secretary, consistent with the provisions of the Highway Act, approved the nonhighway uses of the I–70 right-of-way consonant with the requirement of 23 C.F.R. § 1.23 that the use was "in the public interest" and would not "interfere with the free and safe flow of traffic" on the highway. This

decision of the Secretary to approve the nonhighway use was not arbitrary or capricious. It was not an abuse of discretion. The Secretary's decision was in accordance with law.

### OHIO LAW

Plaintiffs argue that Ohio was without authority to authorize Consol to cross I–70 for three reasons:

1. The Ohio Constitution requires public roads to be open to the public at all times.

2. The Director of Transportation may permit only such special uses and occupancies of the highways as will not incommode the traveling public.

3. Ohio law prohibits access to limited access highways at undesignated access points.

■ The Court has pendent jurisdiction to consider the State law claims for relief because the State and federal claims "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The Court finds that "considerations of judicial economy, convenience and fairness to litigants" make it appropriate to assume the pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. *supra* at 726, 86 S.Ct. at 1139.

Plaintiffs' first argument rests upon the declaration of Article I, § 19 of the Ohio Constitution that the public roads "shall be open to the public." [18] Plaintiffs contend that the crossing of I–70 by Consol's mining equipment would close a public road in violation of Article I, § 19 of the Ohio Constitution. This argument relies upon a construction of

Article I, § 19 made in an Ohio Attorney General's reported opinion at 1955 Ohio Att.Gen. 343. In the Attorney General's opinion, the closing of a mile long section of a rural public highway from 1:00 p. m. to 5:00 p. m. on Sundays to permit drag racing was in violation of Article I, § 19.

■ The Court does not believe that the Attorney General's opinion, which is not a binding judicial interpretation of Ohio law, is dispositive of this case. The State of Ohio has devised a plan for the shovels' crossing which keeps I–70 open to the public. Traffic is rerouted for approximately 1¼ miles.

In the Attorney General's 1955 case, an entire section of road was closed off. No mention is made in the Attorney General's opinion of provisions for alternate routing.

In the present case, the public road—I–70—will remain open to the public. Traffic will continue to flow on it, just as it does when traffic is rerouted for highway repairs. If plaintiffs' interpretation were adopted, Ohio would by constitutional proscription forbid the rerouting of traffic around a section of a public road while repairs were being made. This Court will not read Article I, § 19 so literally as to forbid ordinary highway maintenance.

■ The Court concludes that the rerouting of traffic around a 1¼ mile section of I–70, which is under the circumstances indistinguishable from rerouting traffic round a public road to make repairs, will not violate the command of Article I, § 19 of the Ohio Constitution that public roads "shall be open to the public."

Plaintiffs argue that Consol's use of I–70 is not permissible under § 5515.01,

---

18. Article I, § 19 of the Ohio Constitution states:

Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without

charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.

Ohio Revised Code, which provides in relevant part:

> The director of [Transportation] may upon formal application being made to him, grant a permit to any individual, firm, or corporation to use or occupy such portion of a road or highway on the state highway system *as will not incommode the traveling public.* [Emphasis added]

Plaintiffs argue that by the plain dictionary meaning of the word the proposed crossing of I–70 will "incommode" the public.[19]

The purpose of any highway is to provide transportation to the public. The temporary bypass of a $1\frac{1}{4}$ mile section of a highway, similar to rerouting necessary for normal highway maintenance, does not frustrate this purpose. The highway is still open to traffic for the purposes intended.

 Under such circumstances, the Court holds that the Ohio Director of Transportation did not violate § 5515.01, Ohio Revised Code in issuing a permit to Consol authorizing a crossing of I–70.

Finally, plaintiffs argue that the Ohio Director of Transportation is prohibited by §§ 5535.02 and 3767.201, Ohio Revised Code from granting Consol access to I–70 at an undesignated access point.

Section 5535.02, Ohio Revised Code provides as follows:

> A "limited access highway" or "freeway" is a road, highway, or street, especially designed for through traffic, over which abutters have no easement or right of access by reason of the fact that their property abuts upon such highway. Access may be allowed only at highway intersections designated by the director of highways, board of county commissioners, or municipal authorities on roads within their jurisdiction, so as to eliminate cross traffic of vehicles.

Section 3767.201, Ohio Revised Code provides that:

> No person, firm, or corporation shall cause a vehicle of any character to enter or leave a limited access highway at any point other than intersections designated by the director of highways for such purpose, except in a case of emergency where life or property is in danger.

Additionally, § 5511.02, Ohio Revised Code contains the relevant restrictions found in §§ 5535.02 and 3767.201, Ohio Revised Code:

> A "limited access highway" or "freeway" is a highway especially designed for through traffic and over which abutting property owners have no easement or right of access by reason of the fact that their property abuts upon such highway, and access to which may be allowed only at highway intersections designated by the director.

> Limitations imposed on the mileage of state highways shall not apply to highways established under this section.

The parties are in agreement that I–70 is a limited access highway as defined by § 5511.02, Ohio Revised Code. At issue is the construction of §§ 5535.02 and 3767.201, Ohio Revised Code.

Section 5511.02, Ohio Revised Code contains the same operative language as §§ 5535.02 and 3767.201, Ohio Revised Code, that is, that access to a limited access highway "may be allowed only at highway intersections designated by the director." This language was construed by the Ohio Supreme Court in Rothwell v. Linzell, 163 Ohio St. 517, 127 N.E.2d 524 (1955). In *Rothwell* the plaintiffs contended, as do plaintiffs herein, that the Ohio Director of Transportation was authorized to permit access to limited access highways only at highway in-

---

19. Webster's Third New International Dictionary (unabridged 1966) defines "incommode" as follows:

1a: to give inconvenience or distress to: put out: DISCOMMODE [such delays often incommoded passengers] b: DISTURB, MOLEST [should any player of the fielding side—the striker by any noise or motion—Laws of Cricket] 2 *archaic*: IMPEDE, HANDICAP, OBSTRUCT.

tersections. The Ohio Supreme Court rejected this argument, holding that § 5511.02, Ohio Revised Code *permitted* the Ohio Director of Transportation to limit access to intersections, but did not *require* him to do so.

Plaintiffs attempt to distinguish *Rothwell* on the grounds that in *Rothwell* the Director of Transportation refused to *extinguish* existing non-intersection access points whereas he is herein *creating* a non-intersection access point; and on the grounds that *Rothwell* was decided prior to the implementation of the present federal limited access interstate highway system under the Highway Act.

*Rothwell* cannot be so distinguished. The Ohio Supreme Court carefully stated that the words " 'access to which may be allowed only at highway intersections designated by the director' were merely used by the General Assembly to show the extent to which rights of access to a limited access highway might be curtailed or eliminated." Rothwell v. Linzell, 163 Ohio St. *supra* at 523, 127 N.E. 2d at 529. There is nothing in the decision which would support a distinction between pre-existing highways later designated limited access highways and newly constructed limited access highways.

The passage of the federal Highway Act has no effect on the construction of an Ohio statute.

 The Court further notes that Consol is not being granted what would normally be considered an "access" to a highway. Highway access, by

easement or otherwise, implies a continuing, uninterrupted right to enter a highway right-of-way. Consol's right is limited to permission to cross the right-of-way 10 times in 40 years. Thus, §§ 5511.02, 5535.02 and 3767.201, are not applicable.

The Court holds that Ohio's agreement with Consol permitting Consol's mining equipment to cross I–70 10 times during a period of 40 years is not contrary to Ohio law.

## NATIONAL ENVIRONMENTAL POLICY ACT

In late 1969 Congress passed the National Environmental Policy Act [NEPA] declaring a national policy to "encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321.[20]

Congress enacted a comprehensive statutory scheme to insure that environmental factors were systematically considered and environmental values implemented in federal administrative decisions. The NEPA recognizes a "continuing" responsibility of the federal government to "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

The procedural framework for the federal policy of restoring and maintaining a quality environment is contained in 42 U.S.C. § 4332.[21] The backbone of

---

20. § 4321. Congressional declaration of purpose

 The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

21. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

 (A) utilize a systematic, interdisciplinary approach which will insure the

this procedural safeguard of our environment is the command of § 4332(C) that all federal agencies shall:

include in every .recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environ-

ment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The Secretary of Transportation has not filed an environmental impact statement regarding the effect on the environment of the crossing of I–70 by Consol's mining equipment. Plaintiffs contend that he must do so under the requirements of 42 U.S.C. § 4332(C) that every agency file an environmental impact statement before taking a "major Federal [action] significantly affecting the quality of the human environment." The Secretary

---

integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have a[n] impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdic-

tion by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;
(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;
(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;
(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and
(H) assist the Council on Environmental Quality established by subchapter II of this chapter.

has made a determination that the review and the April 14, 1972 approval of the crossing plans submitted by Consol does not constitute major federal action which makes the NEPA applicable.[22]

█ The applicability of the NEPA to decisions of the Secretary of Transportation involving highway projects has been recognized by reviewing courts without exception. *See, e. g.*, Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972); Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332 (3d Cir. 1972); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613 (3d Cir. 1971); Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971); Conservation Society of Southern Vermont, Inc. v. Volpe, 343 F.Supp. 761 (D.Vt.1972); Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Calif.1972); Morningside—Lenox Park Association, Inc. v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Harrisburg Coalition Against Ruining the Environment v. Volpe, 330

F.Supp. 918 (M.D.Pa.1971); Elliot v. Volpe, 328 F.Supp. 831 (D.Mass.1971). However, the NEPA does not apply retroactively to agency actions taken prior to the effective date of the Act, January 1, 1970.[23] *See,* Concerned Citizens of Marlboro v. Volpe, 459 F.2d *supra*; Arlington Coalition On Transportation v. Volpe, 458 F.2d *supra* at 1330; Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d *supra* at 624; Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d *supra* at 1025; Environmental Law Fund v. Volpe, 340 F.Supp. *supra* at 1332; Environment Defense Fund v. T. V. A., 339 F.Supp. 806, 812 (E.D.Tenn.1972); Elliot v. Volpe, 328 F.Supp. *supra* at 835; Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038, 1039 (D.Or.1970); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 247–248 (M.D.Pa.1970), affirmed 454 F.2d 613 (3d Cir. 1971).

Although the NEPA does not apply retroactively, it does apply to continuing or ongoing federal projects commenced prior to January 1, 1970 when substantial federal actions are yet to be taken after the effective date of the Act.[24] *See,* Brooks v. Volpe, 460 F.2d *supra* at

---

22. Acting Associate Administrator for Right-of-Way and Environment stated the Secretary's decision in a letter of May 24, 1972 [S–12]:

"The proposed crossing is being made in accordance with an agreement between the Federal Government, State of Ohio, and the Hanna Coal Company made in 1964.

. . . . . .

The current reviews by the State are for the purpose of assuring that stipulations in the 1964 agreement have been met and that adequate traffic operating and safety measures are provided and structural integrity of the highway is maintained. The Federal Highway Administration is assisting the State in this review to assure that traffic on the Interstate is disrupted to the minimum degree possible. We do not view our assistance to the State in this matter as a major action."

23. A contrary view is expressed, but not adopted in Morningside—Lenox Park Association, Inc. v. Volpe, 334 F.Supp. *supra* at 145 and in Nolop v. Volpe, 333 F. Supp. *supra* at 1367–1368. *See also,* Zabel v. Tabb, 430 F.2d 199, 211–214 (5th Cir. 1970), cert denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). *See generally,* Note, Retroactive Application of NEPA, 69 Mich.L.Rev. 732 (1971). The question of retroactive application and the question of whether a federal agency has taken a major federal action significantly affecting the environment after the effective date of the NEPA often merge. See p. ——, *supra.*

24. A minority of courts have adopted the more restrictive rule that the NEPA is inapplicable to an ongoing project in which substantial federal action remained to be taken after January 1, 1970 if a "critical" planning decision was made prior to that date. Concerned Citizens

1194; Arlington Coalition on Transportation v. Volpe, *supra* 458 F.2d at 1330–1331; Lathan v. Volpe, 455 F.2d *supra*; Calvert Cliffs' Coordinating Comm. v. A. E. C., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Named Individual Members of San Antonio Conservation Society v. Texas Highway Commission, 446 F.2d *supra*; Boston Waterfront Residents Association, Inc. v. Romney, 343 F.Supp. 89, 91 (D.Mass.1972); Natural Resources Defense Fund, Inc. v. Grant, 341 F.Supp. 356, 363–365 (E.D.N.C. 1972); Environmental Defense Fund v. T. V. A., 339 F.Supp., *supra* at 811–812; Morningside—Lenox Park Association, Inc. v. Volpe, 334 F.Supp. *supra* at 144;

Environmental Defense Fund, Inc. v. Corps of Eng., 331 F.Supp. 925 (D.D.C. 1971); Environmental Defense Fund, Inc. v. Corps of Eng., 324 F.Supp. 878 (D.D.C.1971); Environmental Defense Fund v. Corps of Eng., 325 F.Supp. 728, 743 (E.D.Ark.1970).

The actions taken by the Secretary which might arguably be major federal actions significantly affecting the environment are, in chronological order:

*September 3, 1964.* The Secretary approved an agreement between Consol and Ohio which permitted Consol to cross I–70 with mining equipment 10 times in a 40 year period.[25]

of Marlboro v. Volpe, 459 F.2d *supra* at 335; Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d *supra* at 624; Elliot v. Volpe, 328 F.Supp. at 835; Investment Syndicates, Inc. v. Richmond, 318 F.Supp. *supra* at 1039 (The continuing authority of *Investment Syndicates* is put in question by the Ninth Circuit's decision in Brooks v. Volpe, 460 F.2d *supra* adopting the majority rule stated in the text.) See also, Brooks v. Volpe, 319 F.Supp. 90, 92 (W.D.Wash.1970), motion for rehearing denied 329 F.Supp. 118 (1971), reversed 460 F.2d 1193 (9th Cir. 1971).

Another rule has been adopted by several courts which states that when a "critical" planning decision was made prior to January 1, 1970, the reviewing court determines the applicability of the NEPA by balancing the costs of halting a project with the likely harm to the environment if the project continues as planned and the extent to which the requirements and philosophy of the NEPA were implemented in the original planning decision. Arlington Coalition On Transportation v. Volpe, 458 F.2d *supra* at 1329–1330; Conservation Society of Southern Vermont v. Volpe, 343 F.Supp. *supra* at 766; Environmental Law Fund v. Volpe, 340 F.Supp. *supra* at 1334–1335. The Court does not adopt either of these constructions of the NEPA.

25. The agreement was approved in the following letter dated September 3, 1964 from W. E. Reed, Division Engineer of the Bureau of Public Roads, to P. E. Masheter, Director of Ohio Department of Highways.

"Your letter requested concurrence in the issuance of future permits to allow the Hanna Coal Company to cross Inter-

state 70 when it becomes necessary in view of the cost in delaying time for dismantling and reassembling the large shovels. Your request was transmitted to higher authority and we advise as follows.

In view of the economic and other considerations presented to us with your subject letter, your proposal appears reasonable and we approve the unusual crossings subject to the following additional considerations.

We believe that each individual crossing should be the subject of a separate permit by the state and approval by the Bureau of Public Roads as the crossings may be at different locations and involve different conditions to protect the highway and the traveling public. Adequate control provisions should be established for the maintenance and protection of traffic. Details for the embankment placement for the equipment crossing and the location and type of run-arounds for traffic maintenance should be submitted for review and approval. A maximum time stipulation for the entire operation including construction, equipment crossing, restoration and clean-up appears desirable. We recommend a limitation to one equipment crossing per year with a total of 10 in a 40 year period. The responsibility for the costs involved, construction contracts if any, supervision of construction and traffic control should be designated.

It is not intended to limit the procedure to the above considerations. We have presented them as additional items of importance which we feel should be documented prior to issuing a permit. We are enclosing two copies of a permit issued by the State of Illinois for a similar crossing over Interstate Route 57 for your information.

*November 12, 1964.* The Secretary entered a project agreement for the construction of I–70 across Belmont County, Ohio. The project agreement approved the I–70 right-of-way with a reservation of a right in Consol to cross the highway with mining equipment.[26]

*1968.* The entire length of I–70 in Ohio was constructed and accepted as complete by the Secretary.

*April 14, 1972.* The Secretary found the Ohio Department of Highway's permit for the proposed crossing of I–70 by Consol's mining equipment acceptable. [S–10]

As a first step in determining whether any of these, or associated, actions required or still require compliance, in any manner, with the NEPA, a determination must be made as to whether these actions, or any one or more of them, are "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

 A "major federal action" is one that requires substantial planning, time, resources or expenditure. Clearly the NEPA contemplates some federal actions which are minor, or have so little environmental impact, as to fall outside its scope.

See, Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir. 1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d *supra*; Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. *supra*

at 366; Citizens For Reid State Park v. Laird, 336 F.Supp. 783 (D.Me.1972).

 A federal action "significantly affecting the quality of the human environment" is one that has an important or meaningful effect, directly or indirectly, upon any of the many facets of man's environment. Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. *supra* at 367. The phrase must be broadly construed to give effect to the purposes of the NEPA. A ripple begun in one small corner of an environment may become a wave threatening the quality of the total environment. Although the thread may appear fragile, if the actual environmental impact is significant, it must be considered. *See, e. g.,* Port of New York Authority v. United States, 451 F.2d 783 (2d Cir. 1971) (Recognizing tertiary environmental effects are included within the NEPA's ambit, but withholding federal review during the early stages of agency planning and action).

Reviewing courts have had no difficulty finding that multibillion dollar interstate highway projects are major federal actions significantly affecting the human environment. *See, e. g.,* Arlington Coalition On Transportation v. Volpe, 458 F.2d *supra* at 1330; Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d *supra* 1025.

The Secretary's 1964 approval of the project agreement was a major federal

In order to preserve the integrity of this section of the Interstate Highway, we suggest that a draft of the permit, setting fourth the salient considerations of the procedure between the Ohio State Highway Department and the Hanna Coal Company be prepared and submitted for review and approved by the Bureau of Public Roads."

**26.** The project agreement [S–1] states at p. 3 under "additional provisions":

"It will be necessary for the State to obtain sound enginering estimates using current construction costs to justify and support the economic feasibility of providing land service structures in lieu of pay-

ing severance damages. The engineering estimates shall be the basis for compensating the coal company for future construction of structures. The right of way agreement shall repeat all special considerations granted the coal company, and such agreement shall be subject to review and approval by Public Roads prior to its execution. The right of way agreement shall contain a provision that the proposed points of crossing are to be approved by the State and the Bureau of Public Roads. Approval to be given only after a determination has been made that such proposed points of crossing will not adversely affect traffic operations on the Interstate highway facility.

action significantly affecting the human environment. This federal action included approval of the reservation in Consol of a right to cross I–70. One of the secondary environmental impacts was that the agreement would permit Consol to use the highway to facilitate continued strip mining. The environmental effect of the strip mining, or more accurately the project agreement's impact upon the activity of strip mining as it affects the environment, would have been subject to the requirements of the NEPA had the Act been in force at the time.

The fact that the activity of strip mining is legal in Ohio is of no consequence in relation to the applicability of the NEPA. Many, if not most, environmental effects of federal actions are not forbidden by law; and the NEPA does not prohibit actions which adversely affect the human environment. The NEPA requires consideration of the environmental consequences of all federal actions without regard to their legality or illegality.

The 1968 decision to accept the I–70 project as complete might also have been a major federal action. But in 1968 the project was finished. No substantial ongoing or continuing federal action remained.

In 1964, or at the latest in 1968, the Secretary gave final approval to the I–70 right-of-way, including the agreement between Ohio and Consol which resulted in a reservation in Consol of a right to cross the highway 10 times during a 40 year period. The decision was made. The NEPA does not apply retroactively to these 1964 and 1968 federal actions.[27]

The only continuing or ongoing activity the Secretary reserved for future action was the right to approve the proposed future crossings after determining that the "points of crossing will not adversely affect traffic operations on the Interstate highway facility." [S–1] No further federal actions remained on or after January 1, 1970 with respect to Consol's right to cross I–70. The action of determining that the crossing will not adversely affect the flow of traffic on the highway is not a major federal action. The action does not require substantial planning. The amount of time involved is minimal. Few resources and little money are expended in making the decision.[28]

The action has little or no effect on the environment. The approval of the right of crossing is not a discretionary action. The sole criteria for the Secretary's approval of the crossing plans is the effect of the crossing on the flow of traffic. Environmental consequences are not implicated.

In such circumstances, the NEPA is not applicable to the federal agency action. *See*, Citizens for Reid State Park v. Laird, 336 F.Supp. 783, 789 (D.Me. 1972).

The Court holds that the NEPA is not applicable to any actions of the United States Department of Transportation relating to Consol's right to cross I–70 with mining equipment.

Whereupon, the Court further holds, for the reasons stated in this Opinion, that plaintiffs' motion is without merit, and therefore denied. The Court holds that the motions of the defendant Secretary, the defendant Ohio and the defendant Consol are meritorious, and therefore they are granted.

This action is hereby dismissed.

---

27. See p. 538, *supra.*

28. The Court does not mean to suggest by this analysis that the decisions in an ongoing federal project can be fragmented to avoid Congress's mandate to consider the environmental impact of agency action. In the present case, the project is completed. All major actions have been taken. Only an isolated, mainly ministerial action remains.